696 F.2d 712
 Sherman SWIM; Michaud Creek Ranches, Inc., an Idaho
corporation; Roland G. Allen; Arimo Corporation, an Idaho
corporation; Norman Davis; William T. Evans; Calvin A.
Munn; Donald E. Pickett; Demar H. Gilbert; F. Barlow
Gilbert; James M. Maybey; Don C. Rigby Family Partnership;
Carol E. Wilmore; Russell A. Hebdon; Sara Hebdon; King
Creek Grazing Association; Jay Shipley and John C. White,
Plaintiffs, Appellants, Cross-Appellees,
v.
Robert BERGLAND, Secretary of Agriculture; John R. McGuire,
Chief Forester; Vern Hamre, Regional Forester; and Charles
J. Hendricks, Forest Supervisor, Caribou National Forest,
Defendants, Appellees, Cross-Appellants,
and
Shoshone-Bannock Tribes, Intervenors, Appellees, Cross-Appellants.
 Nos. 81-3479, 81-3526, 81-3530.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Oct. 6, 1982.
Decided Jan. 13, 1983.
As Amended on Denial of Rehearing June 2, 1983.
 
 R.M. Whittier, Pocatello, Idaho, for Swim.
 Dirk Snel, Asst. U.S. Atty., Boise, Idaho, for Bergland.
 John D. Russ, III, Fort Hall, Idaho, for intervenor, appellee, cross-appellant Shoshone.
 Appeal from the United States District Court for the District of Idaho.
 Before WALLACE, FARRIS, and POOLE, Circuit Judges.
 FARRIS, Circuit Judge:
 
 
 1
 These appeals involve the respective rights of certain non-Indian permittees and the Shoshone-Bannock Tribes to graze cattle on federal lands within the Caribou National Forest in Idaho. At issue is the construction of two nineteenth-century legal covenants, the Fort Bridger Treaty of July 3, 1868 between the United States and the Eastern Band of Shoshone and Bannock Tribes, ratified on February 24, 1869, 15 Stat. 209 [p. 673], and the Agreement of February 5, 1898 between the United States and the Shoshone-Bannock Tribes, ratified by the Act of June 6, 1900, 31 Stat. 672.
 
 
 2
 The federal lands in question were originally part of the Fort Hall Indian Reservation, created by the 1868 Treaty and companion Executive Orders as a permanent homeland for the Shoshone-Bannock Tribes. Although the Treaty called for a Reservation of 1.8 million acres, "surveying errors" in 1873 reduced its actual size to approximately 1.2 million acres. Tribal land cessions prior to 1898 further reduced the Reservation to approximately 950,000 acres.
 
 
 3
 By Article I of the 1898 Agreement, 31 Stat. 672, the Tribes ceded approximately 416,000 acres of their remaining Reservation to the federal government. Article II of the Agreement, 31 Stat. 673, provided that the United States would pay the Tribes, on a per capita basis over ten years, a total of $525,000 for the occupancy rights to the ceded lands.
 
 
 4
 Article IV of the 1898 Agreement, 31 Stat. 674, provided for tribal livestock grazing and other use rights on the ceded lands:
 
 
 5
 So long as any of the lands ceded, granted, and relinquished under this treaty remain part of the public domain, Indians belonging to the above-mentioned [Shoshone-Bannock] tribes, and living on the reduced [Fort Hall] reservation, shall have the right, without any charge therefor, to cut timber for their own use, but not for sale, and to pasture their livestock on said public lands, and to hunt thereon and to fish in the streams thereof.
 
 
 6
 The 1900 Ratifying Act, 31 Stat. 672, approved the 1898 Agreement verbatim. By presidential proclamation in 1907, substantial portions of the ceded area were included in the Port Neuf Forest Reserve, now known as Caribou National Forest.
 
 
 7
 Tribal members used the ceded lands within this Forest Reserve for grazing and timber-cutting until late 1907, when Forest Service officials ordered them off the lands. In 1907, or soon thereafter, federal authorities issued grazing permits to non-Indians for use of areas of the Forest which the Tribes had ceded to the federal government in 1898. Since then only non-Indians have held grazing permits within those areas.
 
 
 8
 In 1976 and 1977 the Forest Service issued grazing permits to appellant non-Indian permittees for those portions of the Caribou National Forest which the Tribes had ceded to the government in 1898. These permits, issued pursuant to 16 U.S.C. Sec. 580l, authorize grazing of 2,303 cattle. The total grazing capacity of ceded areas of the Forest is 2,312 cattle. Each permit is effective until December 31, 1985.
 
 
 9
 On February 27, 1978, the Tribes and the United States Forest Service executed a Memorandum of Understanding with regard to grazing rights under the Treaty and the Agreement. This accord, which expires December 31, 1985, implements in part the tribal grazing rights reserved under Article IV of the 1898 Agreement. The Memorandum provides that the Tribes may graze a maximum of 826 head of cattle annually within the ceded areas of the Caribou Forest and that the Forest Service may issue annual permits to non-Indians for any grazing capacity not used by the Tribes. The 1978 Memorandum further stipulates that it does not modify or alter any rights reserved by the Tribes in the 1898 Agreement or the 1900 Ratifying Act.
 
 
 10
 On April 5, 1978, the non-Indian permittees initiated a declaratory judgment action against the Secretary of Agriculture and his subordinates, seeking to enjoin implementation of the Memorandum of Understanding and any resulting reduction in their permitted grazing capacity. After the Tribes intervened, all parties agreed upon specific legal issues for resolution by the district court.
 
 
 11
 In its Opinion and Order of July 7, 1981, the district court refused to invalidate the Memorandum of Understanding, although it found that the 1868 Treaty, the 1898 Agreement, and the 1900 Ratifying Act reserved to the Tribes, as communal rights, only a "fair proportion" of the grazing capacity on the ceded areas of the Caribou National Forest. The court also held that, since the non-Indian permittees possess only revocable privileges to graze on the National Forest lands, the Forest Service may cancel or modify their permits as necessary to implement Tribal grazing rights.
 
 
 12
 The non-Indian permittees appeal from the district court's ruling that the Tribes have continuing grazing rights in the ceded lands. They contend that Article IV of the 1898 Agreement reserved only temporary tribal grazing rights, that these rights have been extinguished by subsequent executive action, and that the Tribes' right to use these lands is no greater than that of any other citizens.[1]
 
 
 13
 The Tribes and the Secretary of Agriculture cross-appeal from the court's determination that the tribally reserved rights encompass only a "fair proportion" of grazing capacity on the ceded lands still in federal ownership. They argue that the 1868 Treaty, the 1898 Agreement, and the 1900 Ratifying Act reserve to the Tribes priority rights on the lands in question. These rights entitle the Tribes and their enrolled members residing on the Reservation to use as much of the grazing on the ceded areas, up to the maximum carrying capacity, as they can. The Tribes do not argue for an exclusive right which would allow them to convey or lease unused grazing capacity to parties not members of the Tribes. They concede that the Tribes must make any unused capacity available to the Forest Service for assignment to non-Indian permittees. This approach is part of the 1978 Memorandum of Understanding and all parties agree that future revisions of that accord will incorporate this policy.
 
 
 14
 We reject the arguments of the non-Indian permittees. We hold that the Tribes have continuing grazing rights on that portion of the Caribou National Forest which the Tribes ceded to the government in the 1898 Agreement. We reverse as to the cross-appeal. The trial court erred in concluding that the Tribes were entitled to only a "fair proportion" of the grazing capacity of these lands. The Fort Bridger Treaty of 1868 and the Agreement of 1898 reserve to the Bannock-Shoshone Tribes priority grazing rights in the ceded lands now part of the Caribou National Forest.
 
 ANALYSIS
 
 15
 I. Grazing rights were reserved by the 1868 Fort Bridger Treaty.
 
 
 16
 Article II of the Treaty secured the Fort Hall Reservation "for the absolute and undisturbed use and occupation" of the Shoshone-Bannock Tribes. The district court correctly concluded that this language clearly encompasses the exclusive right to graze cattle on Reservation lands. The absence of explicit language detailing the specific rights encompassed by "the absolute and undisturbed use and occupation" does not diminish the scope of the rights reserved to the Tribes. In United States v. Shoshone Tribe, 304 U.S. 111, 116-18, 58 S.Ct. 794, 797-98, 82 L.Ed. 1213 (1938), the Supreme Court found that the Fort Bridger Treaty reserved to the Eastern Band of Shoshone Indians the timber and mineral rights on lands within the Wind River Reservation, even though the Treaty was silent as to timber and mineral rights. "For all practical purposes, the tribe owned the land." Id. at 116, 58 S.Ct. at 797. Similarly, grazing rights are within the rights reserved to the Tribes and the absence of specific language to that effect is of no consequence.
 
 
 17
 Further, we are bound to construe the Treaty to reserve to the Tribes all rights necessary to effectuate the purpose of the Treaty. Menominee Tribe v. United States, 391 U.S. 404, 406, 88 S.Ct. 1705, 1707, 20 L.Ed.2d 697 (1968); Winters v. United States, 207 U.S. 564, 575-77, 28 S.Ct. 207, 211, 52 L.Ed. 340 (1908). The trial court found that the parties to the Treaty agreed and understood that the purpose of the Reservation was to enable the Tribes to transform themselves from a nomadic to an agrarian society and that grazing rights were essential to help effectuate this transformation. That finding has support in the record. We agree that both parties to the Treaty understood that the reservation of grazing rights was essential to achieving the purpose of the Treaty. See Skeem v. United States, 273 F. 93, 95 (9th Cir.1921).
 
 
 18
 II. The effect of the 1898 Agreement.
 
 
 19
 a. The Agreement reserved grazing rights in Reservation lands ceded to the federal government.
 
 
 20
 Article IV of the Agreement provides for the reservation of grazing rights:
 
 
 21
 So long as any of the lands ceded ... remain part of the public domain, [the Tribes] shall have the right ... to pasture their livestock on said public lands....
 
 
 22
 371 Stat. 674.
 
 
 23
 Land cession agreements between the United States and Indian tribes are to be interpreted as grants by the Indians to the United States. The Indians reserve any rights not explicitly granted. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, 680-82, 99 S.Ct. 3055, 3071-72, 61 L.Ed.2d 823 (1979); United States v. Winans, 198 U.S. 371, 380-81, 25 S.Ct. 662, 663-64, 49 L.Ed. 1089 (1905). The Tribes reserved grazing rights in the 1868 Treaty lands. Nothing in the 1898 Agreement indicates that the Tribes granted away these rights to the United States.
 
 
 24
 Agreements between the United States and Indian tribes are to be construed according to the probable understanding of the original tribal signatories. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. at 675-76, 99 S.Ct. at 3069. There is nothing in the record to indicate that the Tribes understood that they were ceding their grazing rights along with their possessory rights. The plain language of the Agreement is to the contrary. In addition, by 1898 the Tribes had begun to rely on the production of meat from the communal herd. Not until 1907 did the Forest Service oust the Tribes from the grazing lands. This is further indication that the Tribes did not believe they had given up these rights in 1898.
 
 
 25
 The non-Indian permittees' reliance on United States v. Gemmill, 535 F.2d 1145, 1147-49 (9th Cir.), cert. denied, 429 U.S. 982, 97 S.Ct. 496, 50 L.Ed.2d 591 (1976), is misplaced. We held there only that aboriginal Indian land rights which no treaty, agreement, or statute had specifically recognized were extinguished when, among other things, those lands were included within a national forest.
 
 
 26
 b. The words "public domain" in Article IV of the Agreement include lands within the national forests.
 
 
 27
 The non-Indian permittees argue that even if the Treaty and Agreement reserved Tribal grazing rights in ceded lands, those rights were extinguished because national forests are not part of the "public domain" encompassed by Article IV of the Agreement. The non-Indian permittees rely on the technical argument that "public domain" includes only lands open to sale or settlement under federal law and that the establishment of a forest reserve withdraws those lands from the "public domain." We reject this argument. None of the cases cited by the permittees concerns the abrogation of Indian treaty rights. See Barker v. Harvey, 181 U.S. 481, 21 S.Ct. 690, 45 L.Ed. 963 (1901); Shannon v. United States, 160 F. 870 (9th Cir.1908). Rather, these cases stand for the undisputed proposition that the federal government, by withdrawing lands formerly open to sale or settlement, may lawfully assert a power to control the use of these lands by the public. There is nothing in either of these cases to suggest that this distinction between "public domain" and "reservations" has any bearing on the question of how and when treaty rights of Indian tribes in those lands may be extinguished.
 
 
 28
 In Confederated Tribes of the Umatilla Indian Reservation v. Maison, 262 F.Supp. 871, 873 (D.Or.1966), aff'd sub nom. Holcomb v. Confederated Tribes, 382 F.2d 1013 (9th Cir.1967), the court explicitly rejected a technical reading of treaty language and held that ceded national forest lands are within the scope of expressly reserved Indian off-reservation use rights. In United States v. Blendaur, 128 F. 910, 913 (9th Cir.1904), the court dealt explicitly with the construction of the words "public lands:"
 
 
 29
 The words "public lands" are not always used in the same sense. Their true meaning and effect are to be determined by the context in which they are used, and it is the duty of the court not to give such a meaning to the words as would destroy the object and purpose of the law or lead to absurd results.
 
 
 30
 There is no evidence that the Tribes originally understood the Article IV terms "public domain" and "public lands" in a narrow, legalistic sense. Nor is there any evidence that these terms, when used in 1898, were intended to carry a technical meaning which might ultimately deprive the Tribes of the retained use rights for which they had bargained. The legislative history of the 1900 Ratifying Act reveals no congressional intent that would sustain the permittees' strained construction of these terms.
 
 
 31
 A narrow, technical reading of the words "public lands" and "public domain" would produce an effect which the parties could not have anticipated. Such a reading would render Article IV of the Agreement meaningless by destroying the grazing rights which were to be the vehicle for transforming the Tribes into the agrarian society so much desired by the Government.
 
 
 32
 III. The grazing rights reserved by the Agreement were never extinguished.
 
 
 33
 a. Subsequent executive action.
 
 
 34
 The non-Indian permittees assert that an act of Congress of 1891, 16 U.S.C. Sec. 471 (repealed 1976), empowering the President to withdraw public lands from settlement in order to establish public reservations or national forests, also gave him the power to extinguish Indian treaty rights in those lands. We reject that reading of the 1891 Act.
 
 
 35
 It is well settled that congressional intent to abrogate rights reserved in Indian treaties and agreements must be expressed clearly and unequivocally. E.g., Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. at 690, 99 S.Ct. at 3077 ("[a]bsent explicit statutory language, we have been extremely reluctant to find congressional abrogation of treaty rights"); Menominee Tribe v. United States, 391 U.S. at 413, 88 S.Ct. at 1711 ("[w]e find it difficult to believe that Congress, without explicit statement, would subject the United States to a claim for compensation by destroying property rights conferred by treaty" (footnote omitted)); United States v. Washington, 520 F.2d 676 (9th Cir.1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976).
 
 
 36
 We also reject the non-Indian permittees' argument that, since the 1868 Treaty was effectuated by presidential proclamation, the lands set aside for the Reservation were "executive order" lands rather than "congressional" lands. Relying upon that argument, they contend that unilateral executive action could terminate any rights in those lands without creating a cause of action for compensation. See Hynes v. Grimes Packing Co., 337 U.S. 86, 69 S.Ct. 968, 93 L.Ed. 1231 (1949); Confederated Bands of Ute Indians v. United States, 330 U.S. 169, 67 S.Ct. 650, 91 L.Ed. 823 (1947). Even if we accept the premise that the Reservation was originally created by executive order, in 1900 Congress ratified the 1898 Agreement, which reserved grazing rights to the Tribes. Subsequent congressional action would therefore be necessary to modify or abrogate its terms. The permittees have not pointed to any congressional enactment which purports to abrogate the Tribes' treaty rights, nor do they cite any post-Agreement delegation by Congress to the President of authority to abrogate Indian treaty rights without congressional consent. We agree with the district court's finding that the grazing rights reserved to the Tribes by the 1898 Agreement were not extinguishable by executive action and were not extinguished by subsequent congressional action.
 
 
 37
 b. Indian Claims Commission Docket No. 326-E.
 
 
 38
 In 1967 the Tribes reached a stipulated settlement with the United States for additional compensation for the occupancy rights ceded by the Article I of the 1898 Agreement. The non-Indian permittees assert that the language of this settlement encompasses all claims in regard to Article IV use rights as well. We reject this assertion. There is no evidence in the record that either party to the settlement believed that Article IV rights were involved in the 1967 settlement. In the district court, counsel for the Tribes introduced the affidavit of Robert W. Barker, counsel for the Tribes in the Docket No. 326-E negotiations. Barker stated that to the best of his recollection, grazing rights were neither considered nor discussed as a part of the 1967 stipulated settlement. Counsel for the non-Indian permittees made a timely objection to the admission of the Barker affidavit. We need not decide whether the trial judge erred in denying the objection since the error, if any, was harmless.
 
 
 39
 The non-Indian permittees rely solely on general language of the settlement documents to sweep in Article IV grazing rights, even though all specific language in the pertinent documents, including the original petition, refers only to the low compensation paid for lands ceded in Article I. The Tribes' petition before the Indian Claims Commission did not plead any extinguished grazing rights. The stipulated settlement which reached all claims before the Commission did not encompass tribal grazing rights.
 
 
 40
 c. Laches.
 
 
 41
 The failure of the Tribes to exercise their grazing rights from 1907, when local Forest Service officials ousted them, to 1978 has no effect on the vitality of their Article IV rights. Laches or estoppel is not available to defeat Indian treaty rights. Board of Commissioners v. United States, 308 U.S. 343, 351, 60 S.Ct. 285, 288, 84 L.Ed. 313 (1939); United States v. Ahtanum Irrigation District, 236 F.2d 321, 334 (9th Cir.1956), cert. denied, 352 U.S. 988, 77 S.Ct. 386, 1 L.Ed.2d 367 (1957). This is true even where the Indians have long acquiesced in use by others of affected lands or have purported to grant away their occupancy and use rights without federal authorization. United States v. Southern Pacific Transportation Co., 543 F.2d 676, 699 (9th Cir.1976).
 
 
 42
 IV. The rights reserved by the 1898 Agreement were reserved communally.
 
 
 43
 Article IV of the 1898 Agreement must be construed as a retention of communal use rights by the Tribes in the ceded lands. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. at 679, 99 S.Ct. at 3071. In negotiating the 1898 Agreement the Shoshone-Bannock Tribes "bargained as an entity for rights which were to be enjoyed communally." United States v. Washington, 520 F.2d at 688. The Tribes owned the Reservation in common at the time of the 1898 Agreement, and they maintained a communal cattle herd, purchased with Tribal cession funds, from 1895 into the early part of this century.
 
 
 44
 The 1978 Memorandum of Understanding properly recognizes that the Article IV right to graze ceded lands "is a tribal right for adjustment by the tribe." Whitefoot v. United States, 293 F.2d 658, 663 (Ct.Cl.1961), cert. denied, 369 U.S. 818, 82 S.Ct. 629, 7 L.Ed.2d 784 (1962). We agree with the district court that use of the communal grazing rights by the Tribes as an entity and by Indian livestock owners residing on the Reservation will further the objective of self-sufficiency implicit in the 1868 Treaty and the 1898 Agreement.
 
 
 45
 V. The Agreement reserved priority grazing rights to the Tribes.
 
 
 46
 The district court erred in finding that the 1898 Agreement reserved only a "fair proportion" of the grazing rights in the lands in question to the Tribes. There is no language in the Agreement granting or reserving use rights in the grazing lands to non-Indians. In the absence of such language, an Indian treaty may not be read to grant such rights to non-Indians. Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. at 684-85, 99 S.Ct. at 3073-74; United States v. Washington, 520 F.2d at 683. Both of these cases held that the explicit use of the words "in common with" in the treaties granted non-Indians an equal share of the disputed resource.
 
 
 47
 There is no "in common with" language in the Agreement. By the terms of the Agreement, the Tribes did not grant use rights to non-Indians. The trial judge erred in inferring the grant of such rights. The "fair proportion" principle could result in the Tribes enjoying only a small portion of the available grazing capacity. Under the 1978 Memorandum of Understanding the Tribes were allotted approximately one-third of the available capacity. Since the trial judge ruled that a determination of "fair proportion" would be based on historical factors, including the relative frequency and intensity of use by both Indian and non-Indian users, the Tribes could lose much of their grazing rights, since from 1907 to 1978 the Forest Service effectively kept them off the land. They do not yet own a sufficient number of livestock to take full advantage of the rights reserved by the Agreement and allotted to them by the Memorandum of Understanding.
 
 
 48
 The source and authority of the trial judge's conclusion that the Tribes were entitled only to a "fair proportion" of the available grazing capacity is not evident from the record. Our de novo examination of the written record reveals no ambiguity in the language of the Agreement that would allow for such a conclusion. Even such an ambiguity would not resolve the issue in favor of the non-Indian permittees. It is a well settled rule of construction in Indian law that any ambiguity in treaty language must be resolved in favor of the Indians. Antoine v. Washington, 420 U.S. 194, 199-200, 95 S.Ct. 944, 948, 43 L.Ed.2d 129 (1975); Skeem v. United States, 273 F. at 95.
 
 
 49
 We conclude that "priority" is the proper measure of the scope of the grazing rights reserved to the Tribes by the 1898 Agreement.
 
 
 50
 VI. The permits of the non-Indian permittees may be modified or cancelled in order to implement tribal grazing rights.
 
 
 51
 The non-Indian permittees assert that their grazing permits are property rights which the government may not revoke or modify without compensation. We reject this assertion. The license to graze on public lands has always been a revocable privilege.
 
 
 52
 It is safe to say that it has always been the intention and policy of the government to regard the use of its public lands for stock grazing, either under the original tacit consent or, as to national forests, under regulation through the permit system, as a privilege which is withdrawable at any time for any use by the sovereign without the payment of compensation.
 
 
 53
 Osborne v. United States, 145 F.2d 892, 896 (9th Cir.1944). The rights of the non-Indian permittees in their grazing permits flow from three sources: 16 U.S.C. Sec. 580l ; Permit, Part 2, Sec. 8(b); and 36 C.F.R. Secs. 222.4(a)(1), (6). None of these sources supports their assertion of a property interest in the permits. Section 580l provides:
 
 
 54
 The Secretary of Agriculture in regulating grazing on the national forests and other lands administered by him in connection therewith is authorized, upon such terms and conditions as he may deem proper, to issue permits for the grazing of livestock for periods not exceeding ten years and renewals thereof: Provided, That nothing herein shall be construed as limiting or restricting any right, title, or interest of the United States in any land or resources.
 
 Section 8(b) of the Permit provides:
 
 55
 This permit will terminate whenever the area described in this permit is withdrawn from the National Forest or National Grassland by land exchange, modification of boundaries or otherwise, or whenever the area described in this permit is needed by the Government for some other form of use.
 
 36 C.F.R. Sec. 222.4 provides in part:
 
 56
 (a) The Chief, Forest Service, is authorized to cancel, modify, or suspend grazing and livestock use permits in whole or in part as follows:
 
 
 57
 (1) Cancel permits where lands grazed under the permit are to be devoted to another public purpose including disposal. In these cases, except in an emergency, no permit shall be cancelled without two years' prior notification.
 
 
 58
 * * *
 
 
 59
 * * *
 
 
 60
 (6) Modify the terms and conditions of a permit to conform to current situations brought about by changes in law, regulation, executive order, development or revision of an allotment management plan, or other management needs.
 
 
 61
 We do not ignore the fact that the non-Indian permittees have grazed their cattle on the lands in question for many years. The district court correctly found that the Forest Service could cancel the permits of the non-Indian permittees as needed to implement the Tribes' reserved grazing rights.
 
 
 62
 We affirm insofar as the judgment recognizes the Tribes' continuing grazing rights but reverse the limitation of those rights to a "fair proportion" of available grazing capacity.
 
 
 63
 Affirmed in part, reversed in part.
 
 
 
 [1]
 As the district court noted, the non-Indian permittees' contentions would prevent the Tribes from grazing any cattle on the ceded lands, since federal regulations allow existing permit holders a preference in renewing grazing permits for national forests. 36 CFR Sec. 222.3(c)(1)(ii)