720 F.2d 1461
 STATE OF IDAHO, Plaintiff-Appellee,
and
Membership of Heyburn State Park Leaseholders Association,
Plaintiff/Intervenor Appellee,
v.
The Honorable Cecil D. ANDRUS, Secretary of the Department
of the Interior of the United States of America,
Defendant/Appellant,
and
The Coeur d'Alene Tribe of Indians, Defendant/Intervenor Appellant.
 No. 80-3013.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 6, 1981.
Remanded Aug. 5, 1981.
Resubmitted on Filing of
Supplemental Briefs.
Decided Dec. 1, 1983.
 
 Robie G. Russell, Deputy Atty. Gen., David W. Hyde, Martin, Chapman, Martin & Hyde, Boise, Idaho, for plaintiff/appellee.
 Robert D. Dellwo, Dellwo, Rudolf, & Schroeder, P.S., Spokane, Wash., for defendant/appellant.
 Appeal from the United States District Court District of Idaho.
 Before: KILKENNY and SNEED, Circuit Judges, and QUACKENBUSH, District Judge.*
 KILKENNY, Circuit Judge:
 
 FACTS
 
 1
 On April 30, 1908, Congress authorized the State of Idaho to purchase from the United States land withdrawn from the Coeur d'Alene Indian Reservation, Act of 1908, ch. 153, 35 Stat. 70, 78. In 1911, the land was conveyed to the state by patent, which contained language requiring that the property be used solely for park purposes. The United States was given a reversionary interest and a right of re-entry to the land if it were not maintained as a public park.
 
 
 2
 After the state began a private cottage leasing practice, the Coeur d'Alene Indian Tribe (Tribe) claimed that the practice violated the condition subsequent language of the patent. Following investigation into the uses to which the land was being put, the state brought suit in the Idaho District Court seeking a declaratory judgment that it was in compliance with the patent condition. The United States later filed suit, claiming that the patent's condition had been breached and seeking to quiet title to the property. The suits were consolidated for trial and the Tribe was granted limited leave to intervene as a defendant.
 
 
 3
 The district court, 566 F.Supp. 15, granted summary judgment in favor of the state. Both the United States and the Tribe appealed. A panel of this court granted the United States' motion for voluntary dismissal of its appeal and denied the Tribe's motion for reconsideration of the dismissal. Prior to oral argument on the Tribe's appeal, the state moved to dismiss the appeal on the ground that the reversionary interest flowed solely to the United States and, therefore, no case or controversy existed as to the Tribe. This panel then remanded to the district court for the limited purpose of determining whether the Tribe possessed a beneficial interest in the reversion. The district court held that the Tribe lacked a beneficial interest. The Tribe appeals. We reverse.
 
 HISTORICAL BACKGROUND
 
 4
 The Coeur d'Alene Indian Reservation was established by Executive Order in 1873 and comprises roughly 590,000 acres. In consideration, the Tribe agreed through an unratified 1873 Parley and Agreement to cede approximately four million acres of aboriginal land to the United States. In 1891 the Tribe formally ceded to the United States the tribal aboriginal land outside the 1873 reservation, Act of 1891, ch. 543, 26 Stat. 989, 1027. Appropriation bills were passed to compensate the Tribe and its members for the land ceded.
 
 
 5
 Pursuant to the Allotment Act of 1906, ch. 3504, 34 Stat. 325, 335, Congress authorized allotment of 160 acres of reservation land to each tribal member, and opened for homestead entry the unallotted lands. The Act provided in part as follows:
 
 
 6
 That the Secretary of the Interior ... is hereby, authorized and directed, as hereinafter provided, to sell or dispose of unallotted lands in the Coeur d'Alene Indian Reservation, ....
 
 
 7
 34 Stat. at 335. The receipts from the sales were to be deposited in the United States Treasury to the Tribe's credit, and the monies were to be spent for their benefit. The purpose of the Act was
 
 
 8
 [m]erely to have the United States ... act as trustee for said Indians in the disposition and sales of said lands and to expend or pay over to them the net proceeds derived from the sales.... [Emphasis added]
 
 
 9
 34 Stat. at 337.
 
 
 10
 Before the reservation was opened for settlement, however, Congress withdrew a portion of the land, comprising 6,774.65 acres, from allotment and settlement by the Act of 1908, ch. 153, 35 Stat. 70. The Act authorized the Secretary of the Interior to convey the land to the State of Idaho for use as a public park:
 
 
 11
 That the land in the following subdivisions now embraced in the Coeur d'Alene Indian Reservation in Idaho, to-wit: ... is reserved and withdrawn from allotment and settlement, and the Secretary of the Interior is hereby authorized to convey any part thereof to the State of Idaho to be maintained as a public park, said conveyance to be made for such consideration ... as the Secretary of the Interior shall prescribe. The proceeds of such sale shall be deposited in the Treasury of the United States for the benefit of the Coeur d'Alene Indians in such manner as Congress shall hereafter prescribe. [Emphasis added]
 
 
 12
 35 Stat. 78, 79.
 
 
 13
 Subsequently, the land was conveyed to the state for $11,379.17 on June 28, 1911, under a patent setting forth the following conditions:
 
 
 14
 Whereas, the Act of Congress ... authorizes the conveyance to the State of Idaho of the following described subdivisions ..., formerly a part of the Coeur d'Alene Indian Reservation in Idaho ....
 
 
 15
 Whereas, by appraisement under direction of and approved by the Secretary of the Interior, the purchase price to be paid by the State of Idaho for the said lands has been fixed at $11,379.17 and said Secretary has directed that said lands be conveyed to the state, upon payment ..., upon the following terms and conditions, to-wit: the lands are to be by said state held, used, and maintained solely as a public park, ..., the title to revert to the United States ..., absolutely if the said lands, ..., shall not be, ..., so used and maintained by the state, ... and in the event of the violation by the state of any of the conditions ..., then the United States may ... enter upon, and into the exclusive possession of, the said lands, ..., and have, hold, seize, and possess the same: .... [Emphasis added]
 
 ISSUES
 
 16
 (1) Did the Act of 1908, ch. 153, 35 Stat. 70, and its related legislation create or preserve a beneficial interest in the Tribe which it could assert in this litigation?
 
 
 17
 (2) Even if the Tribe does have a beneficial interest, does the United States' voluntary dismissal from this appeal preclude the Tribe from appealing the case as well?
 
 DISCUSSION
 
 18
 The State of Idaho (state) and the Heyburn State Park Leaseholders Association argue that the Act of 1908 disestablished the Coeur d'Alene Reservation and thereby extinguished Indian title and interest in the property. Consequently, the right of re-entry created in the patent of 1911 was created for the sole benefit of the United States. Further, voluntary dismissal by the United States precludes the Tribe from appealing the case.
 
 
 19
 The Tribe argues that the Act of 1908 failed to extinguish the Tribe's beneficial interest. The United States' trustee status, as created in the Allotment Act of 1906, therefore remains in force despite the Act of 1908. The Act of 1958, Pub.L. No. 85-420, 72 Stat. 121, restored title to the Tribe to the lands as well.
 
 STANDARD OF REVIEW
 
 20
 Once Congress has established a reservation all tracts within it remain a part of the reservation until separated therefrom by Congress. United States v. Celestine, 215 U.S. 278, 285, 30 S.Ct. 93, 94, 54 L.Ed. 195 (1909). Extinguishment of Indian title may be accomplished "by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise." United States v. Dann, 706 F.2d 919, 928 (CA9 1983) (quoting United States v. Santa Fe R.R., 314 U.S. 339, 347, 62 S.Ct. 248, 252, 86 L.Ed. 260 (1941)).
 
 
 21
 The general rule is that doubtful expressions are to be resolved in favor of the weak and defenseless people who are wards of the nation, dependent upon its protection and good faith. McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973) (quoting Carpenter v. Shaw, 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930)). However, the general rule does not command a determination that reservation status survives in the face of congressionally manifested intent to the contrary. Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 587, 97 S.Ct. 1361, 1363, 51 L.Ed.2d 660 (1977).
 
 
 22
 Congressional intent to abrogate rights reserved in Indian treaties and agreements must be expressed clearly and unequivocally. Swim v. Bergland, 696 F.2d 712, 717 (CA9 1983); see Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n, 443 U.S. 658, at 690, 99 S.Ct. 3055 at 3076, 61 L.Ed.2d 823 ("[a]bsent explicit statutory language, we have been extremely reluctant to find congressional abrogation of treaty rights"); Menominee Tribe v. United States, 391 U.S. 404 at 413, 88 S.Ct. 1705 at 1711, 20 L.Ed.2d 697 ("[w]e find it difficult to believe that Congress, without explicit statement, would subject the United States to a claim for compensation by destroying property rights conferred by treaty" (footnote omitted)).
 
 
 23
 The question of whether title to Indian land has been extinguished is separate from the question of disestablishment. See Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 601 n. 24, 97 S.Ct. 1361, 1370 n. 24, 51 L.Ed.2d 660 (1977). While Congress has the authority to disestablish (diminish) a reservation and extinguish title, it may do either without the other. As the court in Swim v. Bergland, 696 F.2d 712 (CA9 1983) noted:
 
 
 24
 [t]hese cases ... stand for the undisputed proposition that the federal government, by withdrawing lands formerly open to sale or settlement, may lawfully assert a power to control the use of those lands by the public.... [n]othing ... [in these cases] ... suggest[s] that this distinction between "public domain" and "reservations" has any bearing on the question of how and when treaty rights of Indians in those lands are extinguished.
 
 
 25
 696 F.2d at 717.
 
 
 26
 In the present case, therefore, our threshold task is to determine whether the Act of 1908 and its related legislation created or preserved a beneficial interest in the Tribe which it could assert in this litigation. In making that determination, we examine the face of the Act itself, its legislative history, and the surrounding circumstances. Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 587, 97 S.Ct. 1361, 1363, 51 L.Ed.2d 660 (1977); see Mattz v. Arnett, 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973).
 
 BENEFICIAL INTEREST IN TRIBE FACE OF ACT
 
 27
 The Act of 1891, ch. 543, 26 Stat. 989, constitutes congressional action by which the Tribe gave up all rights they may have held to their tribal aboriginal land. The Act states in part as follows:
 
 
 28
 For the consideration hereinafter stated the said Coeur d'Alene Indians hereby cede, grant, relinquish, and quitclaim to the United States all right, title, and claim which they now have, or ever had, to all lands ..., except ..., ... the Coeur d'Alene Reservation. [Emphasis added]
 
 
 29
 26 Stat. 989, 1027 (1891). See, e.g., DeCoteau v. District Cty. Ct., 420 U.S. 425, 439 n. 22, 95 S.Ct. 1082, 1090 n. 22, 43 L.Ed.2d 300 (1975).
 
 
 30
 The Allotment Act of 1906 created in the United States the role of trustee for the Tribe in the disposition and sale of the unallotted lands. The Act specifically provided that, after depositing the sale proceeds in the United States Treasury, the monies were to be expended toward the Indians' education, improvement, the purchase of livestock, farm implements and building materials. The Act also provided that the Tribe members were to receive a per capita payment out of the proceeds, and that any sums placed in the United States Treasury were to draw interest. 34 Stat. at 337. See Ash Sheep Co. v. United States, 252 U.S. 159, 165-66, 40 S.Ct. 241, 242-43, 64 L.Ed. 507 (1920) (similar language embodied in a cession agreement held to create relationship between United States and tribe of trustee and beneficiary).
 
 
 31
 Given that the Act of 1906 did create a beneficial interest, that of beneficial ownership of the unallotted lands, we now consider whether the Act of 1908 extinguished that interest. The state has the burden of showing clear congressional intent to extinguish the Tribe's beneficial interest in the lands. See DeCoteau v. District Cty. Ct., 420 U.S. 425, 444-45, 95 S.Ct. 1082, 1092-93, 43 L.Ed.2d 300 (1975). Boundary diminishment of the reservation by the Act of 1906 does not, however, automatically relieve the United States of its trustee status. See Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 601 n. 24, 97 S.Ct. 1361, 1370 n. 24, 51 L.Ed.2d 660 (1977) (quoting Court of Appeals, "the fact that a beneficial interest is retained does not erode the scope and effect of the cession made, ..."); Swim v. Bergland, 696 F.2d at 716-17.
 
 
 32
 In Hanson v. United States, 153 F.2d 162 (CA10 1946), a 1902 Allotment Act provided for an allocation of acreage and a corresponding payment to each Indian following sale of the unallotted lands. In 1943 a trespass occurred on part of the unallotted lands. The Court of Appeals for the Tenth Circuit held:
 
 
 33
 We think it clear that, while the legal title passed to the United States and the lands were subject to entry and sale, the beneficial title remained in the Indians and the United States held the lands as trustee for the Indians.
 
 
 34
 153 F.2d at 163. True enough, Hanson is distinguishable from this case in that the court's holding there applied to the undisposed of, unallotted lands, not to those lands withdrawn from entry and sale. Although some of the unallotted lands in Hanson were withdrawn from entry and sale, the court did not rule on the United States' trustee status as regards the withdrawn lands. However, Hanson is applicable here in that it supports the proposition that a trust relationship between the United States and an Indian tribe continues even though the United States has acquired legal title to the lands.
 
 
 35
 The district court found it significant that the Act of 1908 did not expressly state that the Secretary of the Interior would be acting as trustee for the Tribe, in view of the "trustee" language present in the Act of 1906. The court deemed this difference significant when it examined cases dealing with congressional intent to diminish reservation boundaries. Compare DeCoteau v. District Cty. Ct., 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975) (payment of sum certain important factor in finding relinquishment of tribe's right to land) with Mattz v. Arnett, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973) (consideration of uncertain future sales of land to settlers important factor in finding that tribe retained interest in land).
 
 
 36
 The district court's holding is not supported by the authorities. DeCoteau involved a land cession agreement, similar in terms to that of the Act of 1891 involving the Coeur d'Alene Indians. Further, the language used in the cession agreement in DeCoteau was, "[t]he ... Indians hereby cede, sell, relinquish, and convey to the United States all their claim, right, title, and interest in and to all the unallotted lands ...." 420 U.S. at 445, 95 S.Ct. at 1093 [Emphasis added]. No similar language is present in the Act of 1908. The Supreme Court in DeCoteau never discussed whether the United States' trustee status survived the termination of the reservation. The district court also erred in relying on diminishment cases, which, as explained above, present a separate question from that of extinguishment. See Swim v. Bergland, 696 F.2d at 716-17.
 
 
 37
 Comparison of the Act of 1908 with language used in other statutes shows that the words "reserved and withdrawn" are not the same as any other language which the courts have found to be "explicit" language of fee title termination. See, e.g., Confederated Salish & Kootenai Tribes v. Namen, 665 F.2d 951, 955 n. 4 (CA9 1982) (Namen II) (discussing the Act of July 27, 1868, ch. 248, 15 Stat. 198, 221 [reservation "is hereby discontinued"]; Act of July 1, 1892, ch. 140, 27 Stat. 62 ["Reservation ... is vacated and restored...."] Act of April 21, 1904, ch. 1402, 33 Stat. 189, 218 ["reservation lines ... are hereby abolished"]. Nor is the language tantamount to the slightly less explicit language of cession which has been held to be "precisely suited" to diminish reservation boundaries. See Namen II, 665 F.2d at 955; see also Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 597, 97 S.Ct. 1361, 1368, 51 L.Ed.2d 660 (1977) (tribe agreed to "cede, surrender, grant, and convey to the United States all their claim, right, title and interest ...").
 
 
 38
 The state argues that use of the word "convey" indicates that the United States was free to pass complete title to the state. In the absence of any affirmative showing of such meaning in the Act itself, it cannot be said that use of the word "convey" suggests clear congressional intent to extinguish title. In fact, the pertinent section of the Act reads that the Secretary is "authorized to convey any part ... upon such terms and conditions as the Secretary of Interior shall prescribe." This language provides strong evidence for concluding that Congress intended that the Secretary of Interior would be executing the later patent in his role as trustee for the Tribe. See Nevada v. United States, --- U.S. ----, ----, 103 S.Ct. 2906, 2923, 77 L.Ed.2d 509 (1983) ([t]he United States undoubtedly owes a strong fiduciary duty to its Indian wards (citation omitted)).
 
 
 39
 Finally, notwithstanding the state's argument that the "trustee" language contained in the Act of 1906 was not duplicated in the Act of 1908, the latter Act does state that the proceeds from the sale of the lands were to be deposited in the United States Treasury for the benefit of the Coeur d'Alene Indians. The state suggests that this language would be superfluous if the United States' trustee status as established in the Act of 1906 remained in effect. This presents a no-win argument for the Tribe: either the language is not sufficient to constitute continuing trustee status on the part of the United States, or the language was inserted to obligate the United States to perform a duty even though no trustee status existed. The state's argument fails. The Act of 1906 clearly directs that the proceeds arising from the sale of the unallotted lands were to be
 
 
 40
 deposited in the Treasury of the United States to the credit of the Coeur d'Alene ... Indians ..., and shall be expended for their benefit, under the direction of the Secretary of the Interior, ....
 
 
 41
 34 Stat. at 337.
 
 
 42
 Compare the above language to that present in the Act of 1908:
 
 
 43
 The proceeds of such sale shall be deposited in the Treasury of the United States for the use and benefit of the Coeur d'Alene Indians in such manner as Congress shall hereafter prescribe.
 
 
 44
 35 Stat. at 79. Except for the more detailed explanation in 1906 no significant difference exists between the two sections. That Congress may have intended the United States' trustee status to remain after passage of the Act of 1908 is as probable an explanation of congressional intent as it is that the status was not to continue. It cannot be said, therefore, that the face of the Act indicates clear congressional intent to extinguish the Tribe's beneficial interest.
 
 LEGISLATIVE HISTORY
 
 45
 The district court held that the legislative history shows clear congressional intent to make a sale of all of the withdrawn lands for a sum certain representing the appraised value of the lands. Cf. DeCoteau v. District Cty. Ct., 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975).
 
 
 46
 We find the legislative history, at best, to be "equivocal." See Namen II, 665 F.2d at 956-57. First, the Congressional Record shows that Senator Heyburn, author of the original bill, S. 8316, which eventually died in the House, never intended a state park to be established.[1] Rather he tried to establish a national park. See 42 Cong.Rec. 3378 and 48 Cong.Rec. 8037-39. Similarly, it cannot be said that the Tribe ever consented to the taking of reservation land for a state park. Although tribal consent is unnecessary so long as compensation is paid, see Swim v. Bergland, 696 F.2d 712, 717 (CA9 1983), the wording of an agreement and the embodiment of such a prior agreement into statutory language is relevant in construing the import of questioned legislation:
 
 
 47
 Polson urges us to assume that the Flathead Act expressed the same congressional policy and underlying purpose as three other statutes that were enacted within the same week to open all or part of three other reservations. (footnote omitted) Two of these statutes have been held to terminate the reservation status of the areas involved. ["The Rosebud Act terminated the reservation status of a portion of the Rosebud Sioux Reservation. Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). The Crow Act terminated a portion of the Crow Reservation. Hawkins v. Christ, No. CV 76-99-BLG (D.Mont. January 27, 1978)" n. 13]. This argument, however, overlooks salient differences between the Flathead Act and the other three statutes. All of the others purported to amend and ratify agreements previously negotiated with the affected Indians; they incorporated the text of those prior agreements; and they each contained explicit language of cession. The Flathead Act does not purport to modify a prior cession agreement, since the Tribes had refused to make such an agreement. It contains no language of cession, but merely provides that after allotments to the Indians, the unallotted surplus "shall be disposed of under the general provisions of the homestead, mineral, and townsite laws of the United States." Flathead Act, Sec. 8. [Emphasis added]
 
 
 48
 Namen II, 665 F.2d at 956-57.
 
 
 49
 Unlike Rosebud, nothing the precursor legislation in this case embodies language of cession ("cede, surrender, grant, and convey ... all ... claim, right, title and interest," Rosebud, 430 U.S. at 597, 97 S.Ct. at 1368). To be sure, the precursor legislation does include the provisions "[t]hat the Coeur d'Alene Tribe of Indians shall be paid the appraised value of said lands, ..." 41 Cong.Rec. 3715 (1907). However, the legislative history does little to instruct as to the meaning of "appraisal" and what it was meant to encompass.[2] Thus, while payment of a "sum certain" is a persuasive factor, it has been deemed important only when linked contemporaneously with "explicit" termination language[3] or with contemporaneous or previous "slightly less explicit"[4] language of cession. As emphasized in Rosebud, "method of payment, whether lump-sum or otherwise, is but one of many factors to be considered." 430 U.S. at 598 n. 20, 97 S.Ct. at 1369 n. 20.
 
 SURROUNDING CIRCUMSTANCES
 
 50
 The state asserts that the language in the patent of 1911 indicates that the executive branch understood that the reservation was terminated and that the United States would hold the right of re-entry in its own right. The state supports this argument by pointing out the patent language, "formerly a part of the Coeur d'Alene Indian Reservation," and "title to revert to the United States of America, absolutely."
 
 
 51
 Subsequent legislation, while not always without significance, usually is not entitled to much weight in construing earlier statutes. Namen II, 665 F.2d at 960 (quoting Mattz v. Arnett, 412 U.S. 481, 505 n. 25, 93 S.Ct. 2245, 2258 n. 25, 37 L.Ed.2d 92 (1973)). The language presented here is not entitled to much weight, because it fails to positively support the state's position. A plain reading of the "absolutely" phrase explains the State of Idaho 's status if the patent's conditions were to be violated. That is, if the conditions were violated, Idaho would lose all of its title to the lands. The language does not explain the status of the United States' title upon re-entry.
 
 
 52
 A description of withdrawn lands as being "formerly" a part of the reservation is not entitled to much weight either, because the patent is the only document offered by the state as identifying the lands as having such a status. See Namen II, 665 F.2d at 960 (same argument rejected by court where only two statutes referred to reservation as "former," when tribe produced seventy-two statutes describing reservation as still existing).
 
 
 53
 The state points to a letter[5] dated March 20, 1909, from the United States Secretary of the Interior to the Governor of the State of Idaho concerning the anticipated conveyance in which it is stated that the title "rests with the federal government." Again, such a circumstance does little to "clearly" show what government status, trustee or otherwise, the reference is made.
 
 
 54
 That it can just as easily be said that the Secretary of Interior would use the term "federal government" to indicate trustee rather than grantee status, can be discerned from the Solicitor's Opinion to the Secretary of the Interior. See, e.g., SOLICITOR'S OPINION, 59 I.D. 393, 394 (1947) (draws the conclusion that since the Act of May 27, 1902, 32 Stat. 263 "contain[ed] no declaration that title to the minerals shall vest absolutely in the United States, nor does it make any provisions, it would seem to be clear that the United States, after enactment of the act, continued to hold the title to the surface and to underlying minerals in trust for the Indians....").
 
 
 55
 Finally, the state contends that Idaho's civil and criminal laws were applicable within the park lands. Idaho Sess.Laws 1911 at 335-36 (Sec. 5). The unquestioned exercise of jurisdiction can be helpful in gleaning the meaning to be attributed to relevant statutes. See, e.g., Rosebud, 430 U.S. at 603-04 & n. 27, 97 S.Ct. at 1371-72 & n. 27; see DeCoteau v. District Cty. Ct., 420 U.S. at 449, 95 S.Ct. at 1095. However, under the facts in this case exercise of the state's authority is unhelpful. Regardless of whether the reversionary interest remained in the United States as grantee or trustee, under the statutory scheme the state could exercise its authority so long as it fulfilled the conditions in the patent.
 
 
 56
 Therefore, we hold that the state has not established clear congressional intent in the Act of 1908 to extinguish the Tribe's beneficial interest as created in the Act of 1906. Accordingly, the Act of 1908 preserves the Tribe's beneficial interest and correspondingly its right to participate in this litigation.
 
 UNITED STATES' VOLUNTARY DISMISSAL
 
 57
 The state argues that even if the Tribe holds a beneficial interest, the United States' voluntary dismissal from the appeal precludes the Tribe from separately appealing the case. In support, the state relies on Pueblo of Picuris in State of New Mexico v. Abeyta, 50 F.2d 12 (CA10 1931), where the Court of Appeals for the Tenth Circuit held that the United States decision not to appeal an adverse decision prevented the tribe from appealing the decision on its own. See also Nevada v. United States, --- U.S. ----, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983) (tribe represented by United States in prior action was bound by previous judgment under res judicata ). We reject the state's argument.
 
 
 58
 The cases cited by the state involve actions brought by the United States on behalf of an Indian tribe. In this case, however, the United States did not institute suit on the Tribe's behalf. The Tribe appeals as a defendant/appellant in Case No. 80-3013, following the district court's granting of its motion to intervene. Here, the United States was a plaintiff/appellant in Case No. 80-3014, which was consolidated for trial with the former case. As such, this is not a situation similar to the one in Pueblo where the tribe attempted to continue the appeal after the United States declined to proceed.
 
 
 59
 Likewise, the United States has not acted exclusively for the Tribe at any time during this litigation. In fact, the United States has not opposed the Tribe's right to appeal the district court's decision.
 
 
 60
 The Tribe based its jurisdiction to intervene in part on 28 U.S.C. Sec. 1362, which provides:
 
 
 61
 The district court shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.
 
 
 62
 The legislative history accompanying the Act states in pertinent part:
 
 
 63
 This bill would therefore authorize the addition of only those cases, ... where the tribes have not been able to show that the amount in controversy exceeds $10,000, and the Government for some reason does not want to prosecute the case on behalf of the tribe.... [Emphasis added]
 
 
 64
 Gila River Indian Community v. Henningson, Durham & Richardson, 626 F.2d 708, 711 (CA9 1980), cert. denied, 451 U.S. 911, 101 S.Ct. 1983, 68 L.Ed.2d 301 (1981) (quoting H.R.Rep. No. 2040, 89th Congress, 2nd Sess., reprinted in [1966] U.S.Code Cong. & Ad.News 3145-47).
 
 
 65
 We find no justification for refusing to allow the Tribe the opportunity to appeal the district court's decision. Although the present situation differs from one in which the United States has not prosecuted a case at all, we find no reason to depart from the expressed policy of 28 U.S.C. Sec. 1362. See Fort Mojave Tribe v. LaFollette, 478 F.2d 1016, 1018 (CA9 1973) (quiet title action) (Congress intended by Sec. 1362 to authorize an Indian tribe to bring suit in federal court to protect its federally derived property rights in those situations where the United States declines to act). Having previously decided that the Tribe has a beneficial interest in the withdrawn lands, we now hold that they should not be prevented from protecting that interest in subsequent proceedings.
 
 CONCLUSION
 
 66
 Consequently, the summary judgment of the lower court is set aside and the case remanded for proceedings not inconsistent with this opinion, including, but not limited to, a finding on the nature and extent of the beneficial interest owned by the Tribe in the property mentioned. If the court holds that the beneficial interest is of sufficient magnitude to create an estate in the property adverse to the rights of the state and the lessees, the court shall define that estate and conclude whether such estate is superior to the rights of the leaseholders and for such other declaration of rights, or lack of them, as the court may deem proper. If so desired, the district court may hold a supplemental hearing on the subjects mentioned in this remand.
 
 
 67
 IT IS SO ORDERED.
 
 
 68
 QUACKENBUSH, District Judge, concurring in part, and dissenting in part.
 
 
 69
 I agree with the majority that the face of the 1908 Act, taken with its legislative history and surrounding circumstances did not demonstrate a clear Congressional intent to compensate the Tribe for a fee taking of the Heyburn lands. As a result, the Tribe retains a beneficial interest in the lands, and the United States retains its trustee status with respect to the Tribe. I also agree with the other panel members that the voluntary dismissal by the United States did not preclude further prosecution of this appeal by the Tribe. This separate writing is only to respectfully disagree with a remand, because it is appropriate now to address the issue raised by appellants and previously decided by the district court of whether the State has violated the conditions of the Patent.
 
 
 70
 The status of the United States as trustee or as grantor runs only to the issue of standing of the Tribe to appeal, but does not bear upon the question of whether the State violated the conditions of the Patent in such a way as to entitle the United States to re-enter the Heyburn Park lands. Also, whether the United States' right to re-enter is as trustee, rather than as grantor, is unrelated to the question of whether the State violated the Patent conditions. Thus, the "scope" of the beneficial interest retained in the Tribe runs only to standing.
 
 
 71
 The majority remands this case to the district court with instructions to determine the nature and extent of the Tribe's beneficial interest and "whether such estate is superior to the rights of the leaseholders ..." In my opinion, such a remand is unnecessary since it only raises the question of the standing of the Tribe to pursue the appeal. The Tribe was allowed to intervene at the district court level and this panel has determined that the Tribe has a beneficial interest in the property. Clearly, the Tribe has standing to pursue the appeal. There is nothing left for the district court to determine and this panel should now decide the very issue which brought the case to this court, that is, the district court's decision that the condition subsequent was not violated and that the interest of the State of Idaho in the land in question should not be subject to forfeiture.
 
 
 72
 I respectfully dissent from the remand.
 
 
 
 *
 The Honorable Justin L. Quackenbush, United States District Judge for the Eastern District of Washington, sitting by designation
 
 
 [1]
 That the following subdivisions now embraced in the Coeur d'Alene Indian Reservation, in Idaho, to-wit: ..., is reserved and withdrawn from allotment and settlement and dedicated and set apart as a public park or pleasuring ground for the benefit and enjoyment of the people; Provided, That the Coeur d'Alene tribe of Indians shall be paid the appraised value of said lands,
 SEC. 2 That such public park shall be under the exclusive control of the Secretary of the Interior, whose duty it shall be, as soon as practicable, to make and publish such regulations as he may deem necessary or proper for the care and management of the same.... He shall provide against the wanton destruction of the fish and game found within the park and against their capture and destruction for the purposes of merchandise or profit. He shall also cause all persons trespassing upon the same to be removed therefrom, and, generally, is authorized to take all measures as may be necessary or proper to fully carry out the objects and purposes of this section.
 Heyburn Amendment, 41 Cong.Rec. 3972 (1907).
 
 
 [2]
 The following colloquy took place in the House of Representatives with respect to the amendment which was rejected:
 "Mr. French ... There will be a nominal price put upon the land by the board of appraisers.
 Mr. Mann. What does the gentleman mean by a 'nominal' price?
 Mr. French. The price will be fixed by a board appointed by the Department of the Interior for the purpose of classifying and appraising the value of the land."
 
 
 [41]
 Cong.Rec. 4592 (1907)
 
 
 [3]
 See Opinion at 5650-5651
 
 
 [4]
 Id.; see also DeCoteau v. District Cty. Ct., 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975)
 
 
 [5]
 It will be noted that the Act referred to authorizes this Department to convey any part of said lands to the State, and of course, until such conveyance is consummated, the title to the land rests with the federal government. [Emphasis added]