814 F.2d 1288
 The STATE OF IDAHO, Plaintiff/Appellee,
and
The Membership of the Heyburn State Park Leaseholders
Association, Plaintiff/Intervenor-Appellee,
v.
Donald P. HODEL,* Secretary of the Department of
the Interior of the United States of America, Defendant,
and
The Coeur D'Alene Tribe of Indians, Defendant/Intervenor-Appellant.
 No. 84-4145.
 United States Court of Appeals,
Ninth Circuit.
 Argued Oct. 9, 1985.
Submitted Nov. 1, 1985.
Decided April 9, 1987.
 
 Robie G. Russell and C.A. Daw, Boise, Idaho, for plaintiff-appellee.
 John S. Chapman and Christopher W. Clark, Boise, Idaho, for plaintiff/intervenor-appellee.
 Robert D. Dellwo and Gary T. Farrell, Spokane, Wash., for defendant/intervenor-appellant.
 Appeal from the United States District Court for the District of Idaho.
 Before REINHARDT, BEEZER and HALL, Circuit Judges.
 PER CURIAM:
 
 
 1
 The Coeur d'Alene Tribe of Indians contends that the State of Idaho has violated the terms of a 1911 patent by which land formerly part of the Tribe's reservation was conveyed to Idaho for use as a public park. The Tribe appeals two decisions of the district court: a 1979 grant of summary judgment for Idaho, and a 1984 decision holding that even if Idaho breached the patent the Tribe may not exercise a power of termination. We hold that the Tribe may pursue this appeal irrespective of its ability to exercise a power of termination, but we conclude that the Tribe is not entitled to forfeiture.
 
 
 2
 * BACKGROUND
 
 A. Heyburn State Park
 
 3
 The Coeur d'Alene Indian Reservation, comprising approximately 590,000 acres in Idaho, was established by Executive Order of President Grant in 1873. Pursuant to the Allotment Act of 1906, ch. 3504, 34 Stat. 325, 335, Congress authorized the allotment of 160 acres of reservation land to each member of the Tribe and opened up the unallotted lands to homestead entry.
 
 
 4
 Two years later, before the reservation was opened for settlement, Congress withdrew 6,774.65 acres of the land from settlement and allotment by the Act of 1908, ch. 153, 35 Stat. 70. The Act of 1908 authorized the Secretary of the Interior to convey the withdrawn land to Idaho for use as a public park. 35 Stat. 78, 79. The land that is now Heyburn State Park was conveyed to Idaho on June 28, 1911, under a patent setting forth the following conditions:
 
 
 5
 the lands are to be by said state held, used, and maintained solely as a public park, ... the title to revert to the United States ... absolutely if the said lands, or any portion thereof, shall not be ... so used and maintained by the state, or shall be alienated by said state; and in event of the violation by the state of any of the conditions ..., then the United States may thereupon or at any time thereafter enter upon, and into the exclusive possession of, the said lands ... and have, hold, seize, and possess the same....
 
 
 6
 (emphasis added).
 
 
 7
 The park includes within its boundaries Lake Chatcolet. In 1920, Idaho began issuing permits to maintain float homes on the lake. The State also began leasing waterfront cottage sites. The leases and permits were granted for periods of up to ten years and were regularly renewed until 1976. A lease entitled the lessee to "the exclusive right and privilege to possess and use [the site] in the manner and for the purpose hereinafter contained," but prohibited commercial use and required the lessee to substantially improve the leasehold within two years.[1] In 1975, the Idaho legislature expressly indicated its intent to continue the cottage site leasing program on its state lands, see Idaho Code Sec. 39-3613 (1985), and imposed additional requirements on lessees primarily concerning water and sewage control, see id. Secs. 39-3609 to -3613. In 1976, there were 161 sites leased and 32 existing float home permits in Heyburn State Park covering approximately 21 acres.
 
 
 8
 In 1972, an Assistant Area Director of the Bureau of Indian Affairs, on behalf of the Tribe, wrote to the Director of the Idaho Department of Parks suggesting that the cottage site leasing program violated the terms of the patent, and by letter dated March 3, 1976, the Solicitor of the United States Department of the Interior informed the Idaho Attorney General that the Solicitor's Office had concluded that Idaho was "not in compliance with the conditions of the [1911] conveyance." As a protective measure in the event of a lawsuit, the Idaho Board of Land Commissioners decided on March 9, 1976 not to renew cottage site leases or float-home permits in Heyburn State Park upon their expiration. All leases and permits expired in 1981.
 
 B. Procedural History
 
 9
 Idaho filed suit in federal district court on December 30, 1976, seeking a declaratory judgment that its lease and permit practices did not violate the "public park" and anti-alienation conditions in the patent. In the alternative, Idaho sought a declaration either that its decision not to renew leases and permits constituted compliance with the Department of Interior's request so as to avoid forfeiture, or that granting one-year leases would comply with the patent. On September 7, 1977 the United States filed a complaint claiming the practices violate the conditions in the patent and seeking to quiet title to the property. The suits were consolidated for trial and the court granted the Tribe and the Heyburn State Park Leaseholders Association (Leaseholders) limited leave to intervene.
 
 
 10
 On November 9, 1979, the district court granted Idaho's motion for summary judgment, concluding on the basis of its findings of undisputed facts that Idaho had not violated the conditions in the patent. Both the United States and the Tribe appealed, but before oral argument the United States moved to voluntarily dismiss its appeal, and a panel of this court granted the motion. With only the Tribe remaining, Idaho moved to dismiss the appeal on the ground that no case or controversy existed because any property interest flowed solely to the United States. We remanded to the district court for a determination of whether the Tribe possessed a beneficial interest in the power of termination.
 
 
 11
 On remand, the district court held that the Tribe does not have a beneficial interest in the power of termination. The Tribe appealed, and we reversed. While we held that the Tribe does have such a beneficial interest, we remanded for further proceedings including a determination of the nature and extent of that interest. Idaho v. Andrus, 720 F.2d 1461 (9th Cir.1983), cert. denied, 469 U.S. 824, 100 S.Ct. 101, 83 L.Ed.2d 46 (1984). On this second remand, the district court held, by memorandum dated August 9, 1984, that under the 1911 patent only the United States, and not the Tribe, could exercise the power of termination. The court also concluded that the United States, by virtue of its withdrawal from the litigation, had manifested an intent not to exercise the power of termination. The Tribe appeals.
 
 
 12
 Therefore, two decisions below are before us: first, the district court's 1979 grant of summary judgment in favor of Idaho, and second, the court's 1984 decision holding that the Tribe may not exercise the power of termination contained in the patent.
 
 II
 THE TRIBE'S RIGHT TO MAINTAIN THIS APPEAL
 
 13
 We have already decided that the Tribe has standing to pursue this appeal despite the withdrawal of the United States. Idaho v. Andrus, 720 F.2d at 1469-70 (1984).[2] Idaho and the Leaseholders argue, however, that the district court correctly held that the Tribe may nevertheless not exercise the power of termination provided for in the patent, and that the United States did not exercise that power. We conclude that forfeiture is inappropriate; however, we base our decision on grounds different than those relied on by the district court.[3]III
 
 STANDARD OF REVIEW
 
 14
 Summary judgment is proper where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We review the district court's grant of summary judgment in favor of Idaho and its denial of the Tribe's summary judgment motion de novo. E.g., Ashton v. Cory, 780 F.2d 816, 818 (9th Cir.1986); Lojek v. Thomas, 716 F.2d 675, 677 (9th Cir.1983). Viewing all the evidence in the record in the light most favorable to the non-moving party, we must determine whether there is a genuine issue as to any material fact and, if not, whether the substantive law was correctly applied. E.g., International Union of Bricklayers Local 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1404 (9th Cir.1985); Amaro v. Continental Can Co., 724 F.2d 747, 749 (9th Cir.1984).
 
 IV
 FORFEITURE
 A. Rules of Construction
 
 15
 The district court granted summary judgment to Idaho, concluding that its lease and permit practices did not violate the patent's forfeiture provision. In order to determine whether summary judgment was appropriate, it is important to understand the rules by which the forfeiture provision in the patent must be construed. Cf. Anderson v. Liberty Lobby, Inc., --- U.S. ----, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (on motion for summary judgment, evidence must be considered in light of substantive evidentiary burden).
 
 
 16
 Forfeiture provisions are not favored in the law. E.g., Humphrey v. C.G. Jung Educational Center, 714 F.2d 477, 480-81 (5th Cir.1983) (Texas law); Bornholdt v. Southern Pacific Co., 327 F.2d 18, 20 (9th Cir.1964) (California law; "general legislative and judicial hostility to divesture of properties long held by grantees" (footnote omitted)); Schlegel v. Hansen, 98 Idaho 614, 570 P.2d 292, 293 (1977). Such provisions are construed liberally in favor of the holder of the estate, and a construction which avoids forfeiture must be adopted if at all possible. See Humphrey, 714 F.2d at 480-81; Bornholdt, 327 F.2d at 20; Schlegel, 570 P.2d at 293. These rules have been applied to attempts by the United States to enforce a forfeiture provision in a grant of public land, see Oregon & California Railroad v. United States, 238 U.S. 393, 420, 35 S.Ct. 908, 919, 59 L.Ed. 1360 (1915) ("it is a general principle that a court of equity is reluctant to (some authorities say never will) lend its aid to enforce a forfeiture"); New York Indians v. United States, 170 U.S. 1, 25-26, 18 S.Ct. 531, 537, 42 L.Ed. 927 (1898) ("A condition, when relied upon to work a forfeiture, is construed with great strictness.... [A]ny ambiguity in [the grantor's] deed or defect in the evidence offered to show a breach will be taken most strongly against him, and in favor of the grantee."),[4] and to an attempt by Indians to recover former Indian land conveyed to a county by United States patent on condition that the land be used for cemetery purposes only, see Choctaw and Chickasaw Nations v. Board of County Commissioners, 361 F.2d 932, 934 (10th Cir.1966) (Oklahoma law). Even a breach of a condition may not result in forfeiture if the grantee has "substantially complied" with the terms of the conveyance. See Bornholdt, 327 F.2d at 20-21.
 
 
 17
 The construction of a federal patent is governed by federal law, e.g., United States v. Oregon, 295 U.S. 1, 28, 55 S.Ct. 610, 621, 79 L.Ed. 1261 (1935), and if federal law is silent Congress is presumed to have intended the conveyance to be construed according to the law of the state in which the land lies, unless a contrary congressional intent is shown, e.g., Brewer-Elliott Oil & Gas Co. v. United States, 260 U.S. 77, 88, 43 S.Ct. 60, 64, 67 L.Ed. 140 (1922); Oklahoma v. Texas, 258 U.S. 574, 594-95, 42 S.Ct. 406, 414, 66 L.Ed. 771 (1922) (involving disposal of Indian lands under guardianship of United States). Here, there is no indication as to Congress's intent regarding the appropriate law to apply. Accordingly, where federal law is of no avail we are guided by Idaho law.
 
 
 18
 Idaho law governing the construction of deeds dictates that a court interpreting a deed should be guided by the intention of the parties, in this case the United States and the State of Idaho. Gardner v. Fliegel, 92 Idaho 767, 450 P.2d 990 (1969). The intention of the parties is to be gleaned from the instrument itself, if possible. However, if the language in the deed is ambiguous, the intention must be determined from extrinsic evidence. Id. 450 P.2d at 994; Hogan v. Blakney, 73 Idaho 274, 251 P.2d 209, 213 (1952); McLean v. Row, 56 Idaho 646, 57 P.2d 689, 691 (1936).
 
 
 19
 Accordingly, in construing the phrase "to be ... held, used, and maintained solely as a public park " we must attempt to give effect to the intent of the United States, as expressed by Congress. E.g., Philbrook v. Glodgett, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975). Where, as here, Congress has left a term undefined, it is presumed that the words were used in their ordinary, commonly understood meaning. E.g., Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."); see also, e.g., City of Lewiston v. Mathewson, 78 Idaho 347, 303 P.2d 680, 684 (1956). Since the term "public park" is subject to a host of various interpretations it is appropriate in this endeavor to look to extrinsic evidence relevant to the meaning of the phrase "public park," see, e.g., Leary v. United States, 395 U.S. 6, 37-39, 89 S.Ct. 1532, 1548-49, 23 L.Ed.2d 57 (1969), including evidence of the circumstances prevailing at the time of enactment, see, e.g., United States v. Wise, 370 U.S. 405, 411, 82 S.Ct. 1354, 1358, 8 L.Ed.2d 590 (1962); Burlington Northern Railroad v. Department of Public Service Regulation, 763 F.2d 1106, 1111 n. 3 (9th Cir.1985). Keeping these principles in mind, we must determine whether, in light of all the uncontroverted facts, the district court properly held that Idaho is not required to forfeit the Heyburn State Park land.[5]
 
 B. The "Public Park" Provision
 
 20
 A "public park" is necessarily meant for the use and enjoyment of the public. See, e.g., The Random House Dictionary (Unabridged) 1049 (1979) ("park" is "an area of land ... for the enjoyment of the public"); 67A C.J.S. Park at 604-05 (1978) ("There is general agreement that a park is a place for the resort of the public. Accordingly, a park must be for the benefit of the public at large and open for the use and enjoyment of everyone...." (footnote omitted)); 59 Am.Jur.2d Parks, Squares, and Playgrounds Sec. 1 (1971) (" 'park,' as now commonly understood in this country, means a piece of ground ... for the resort of the public"). This notion, however, is inherently broad and flexible.
 
 
 21
 Idaho argues that leasing portions of a park to private individuals for the maintenance of cottages makes the leased portions available for the use of the public because those who lease the sites are members of the public. This interpretation of the word "public" is, to put it mildly, disingenuous. Everyone is a member of the public. Idaho's theory would make any use of the park a "public" use. For example, under Idaho's approach, the state could execute 99-year leases of 100-acre cottage sites covering all of the park. Clearly such a practice would not be consistent with the requirement in the patent. The practices at issue here are not as demonstrably violative of the patent as those in our example; nevertheless, the mere fact that members of the public lease the park land does not demonstrate that Idaho's leasing practices constitute proper park uses.
 
 
 22
 As we have emphasized supra, forfeiture provisions are to be construed so as to avoid forfeiture if at all possible. Idaho is required to forfeit the land only if its leasing practices are clearly not proper "public park" uses. If there is a legitimate question as to whether those practices violate the patent, forfeiture is barred. In short, summary judgment in favor of Idaho was proper if the uncontroverted evidence in the record, taken as a whole,[6] precludes a determination that the leasing practices constitute a clear and unambiguous violation of the "public park" condition of the patent. Cf. Anderson, 106 S.Ct. at 2513 (in libel action, court considering motion for summary judgment must be guided by "clear and convincing" evidence standard applicable in libel cases).
 
 
 23
 We find historical evidence of park uses helpful in determining whether Idaho's leasing practices clearly constitute improper public park uses. The uncontroverted evidence in the record shows the following: By 1928, at least seven states leased summer homes in their state parks. Pennsylvania had, by 1925, leased over 1,200 sites. Mackinac Island State Park, formerly a national park in which summer cottage leasing was permitted, was patented to Michigan in 1895 with conditions similar to those considered in the present case, and renewable, 21-year summer cottage site leases have been issued up to the present day. The superintendent of the park has stated his opinion that such leasing historically has been considered a proper use of a park for public purposes. Four additional states currently lease summer cottage sites, some of which were planned by the National Park Service.
 
 
 24
 There also is undisputed evidence of cottage leasing in the early 1900's in the national parks. In Glacier National Park, established in 1908 by the same Congress that authorized the Secretary of the Interior to convey the land involved in the instant case to Idaho for use as a public park, leasing of sites for up to 20 years was authorized by statute. Leasing was also authorized in Lassen Volcanic National Park, which was established in 1916, and by 1920 when Idaho began its leasing program in Heyburn State Park, 1,600 leases had been executed. The United States Forest Service has in the past leased sites on its lands, including sites in Idaho around 1920. Additionally, the federal government permits permanent private landholdings in the national parks. For example, in Yosemite National Park there are approximately 200 acres of privately owned land. The private tracts of land contain permanent houses, seasonal residences, mobile homes, rental cabins, a hotel, grocery store and a gas station. J. Lambert, Private Landholdings in the National Parks: Examples From Yosemite National Park and Indian Dunes National Lakeshore, 6 Harv.Envtl.L.Rev. 35, 41 (1982). Private landowners in the Indian Dunes National Lakeshore may sell their land to the federal government and obtain a twenty-five year leaseback. J. Lambert, supra at 51. Thus, the federal government tolerates permanent private inholdings in the national parks and encourages leasebacks for those landowners willing to sell their property to the government.
 
 
 25
 The record also shows that leasing of sites in both Glacier National Park and Lassen Volcanic National Park has been prohibited since 1931. See 16 U.S.C. Secs. 162a, 202a (1982). Beginning in the 1950's and 1960's, the federal government departed from its policy of leasing sites on its lands, including Forest Service lands. Now, the Forest Service's goal is to eliminate leaseholds on virtually all its lands. However, this shift in the federal government's leasing policy does not mean that the terms of the original Act of 1908 also shift or change over time in such a way as to mirror current notions concerning the proper use of public parks. The words of an instrument are to be given the meaning that they were given when the instrument was executed.
 
 
 26
 Courts which have been called on to construe ambiguous passages in federal patents have limited their analysis to ascertaining what Congress originally intended in the grant. See Missouri, Kansas and Texas Ry. Co. v. Kansas Pacific Ry. Co., 97 U.S. (7 Otto) 491, 497, 24 L.Ed. 1095 (1878) (land grants to railroad companies intended by Congress to aid in construction of railroads); Leo Sheep Co. v. United States, 570 F.2d 881, 885 (10th Cir.1977), rev'd on other grounds, 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979) (intent of Congress in 1862 when it granted railroad companies odd-numbered sections of land on both sides of proposed railroads "was to 'open up' the West and develop it"); Macdonald v. United States, 119 F.2d 821, 825 (9th Cir.1941) (Congressional policy underlying 1875 land grant was "to promote settlement and to enhance the value of the public domain"), modified, Great Northern Railway Co. v. United States, 315 U.S. 262, 62 S.Ct. 529, 86 L.Ed. 836 (1942). Employing the principles articulated in the above cases, our task is to discern congressional intent in 1908. In light of the prevalence of cottage leasing in national as well as state parks in the early 1900's, it is obvious that Congress did not intend to prohibit the practice. If Congress had wished to prohibit such a widely-accepted practice, it certainly would have done so expressly in the Act of 1908.
 
 
 27
 The evidence that leasing practices historically were considered to be proper park uses is sufficient to preclude a holding that Idaho has clearly violated the "public park" restriction. Because Idaho's practices comport with a historical notion of proper park use, we hold that forfeiture is not an appropriate remedy in this case.
 
 
 28
 We also note that the State of Idaho must have the authority to administer and operate its state parks. Federal courts should not interfere with a state's administration of its parks unless it is necessary to protect an important federal right. The Idaho legislature has delegated the power to operate, maintain and develop state parks to the Idaho department of parks and recreation. Idaho Code Sec. 67-4219. Pursuant to this delegation of authority, the park and recreation board exercises vast powers in its administration of the Idaho state park system. Idaho Code Sec. 67-4223. The park and recreation board is vested with the authority to lease park land in all Idaho state parks, Idaho Code Sec. 67-4223(g) (1986 Supp.), and specifically in Heyburn State Park, Idaho Code Sec. 67-4204. This court must defer to the board's leasing policy unless the policy substantially infringes on an important federal right. Absent such deference the federal courts will become embroiled in the day-to-day operation of state parks.
 
 
 29
 State courts have traditionally deferred to the discretion of city park commissioners in the administration of public parks. These courts have condoned many different private, and quasi-private, uses of public park land. For instance, city park administrators may set aside public park land for recreational or athletic purposes. Shields v. City of Philadelphia, 405 Pa. 600, 176 A.2d 697 (1962) (public park land may be set aside for use as a little league baseball diamond); Summit County Historical Society v. City of Akron, 115 Ohio App. 555, 183 N.E.2d 634 (1961) (public square may be converted into ice rink); Aquamsi Land Co. v. City of Cape Girardeau, 346 Mo. 524, 142 S.W.2d 332 (1940) (construction of stadium, race track and athletic fields permitted on park land). The courts have approved using park land to provide temporary housing during emergencies, Hyland v. City of Eugene, 179 Ore. 567, 173 P.2d 464 (1946) (veterans may reside in trailer homes in park for two years during temporary housing shortage following World War II), and leasing subsurface rights for the purpose of constructing a parking garage. City and County of San Francisco v. Linares, 16 Cal.2d 441, 106 P.2d 369 (1940) (parking garage built under Union Square). Courts have also held that long term leases to operate hotels or restaurants are consistent with a "public park" restriction. 795 Fifth Avenue Corp. v. City of New York, 13 A.D.2d 733, 215 N.Y.S.2d 391 (1961); Harter v. City of San Jose, 141 Cal. 659, 75 P. 344 (1904). Thus, the courts will typically defer to the park commission's judgment governing the allocation of park resources and use of park land. We find these cases persuasive. In this case we cannot conclude that the Idaho park and recreation board exceeded its ample authority through its leasing practices. Moreover, we emphasize that only one-third of one percent of the land in Heyburn State Park is subject to the lease restrictions at issue in this action. A court must refrain from finding a violation of a "public park" restriction when only a small segment of land in the park is affected. Angel v. City of Newport, 109 R.I. 588, 288 A.2d 498 (1972); Nichols v. City of Rock Island, 3 Ill.2d 531, 121 N.E.2d 799 (1954). To justify forfeiture, there must be a substantial deviation from commonly accepted forms of public usage. Here, 99.67% of the land in Heyburn State Park is unencumbered by the contested leases. It is not essential that the public have unrestrained access to every square foot of land within a park to make it "public." Consequently, we hold that, given the small size of the area where leases are allowed, the Idaho park and recreation board has not exceeded the scope of its authority to administer and operate Heyburn State Park.
 
 V
 THE ANTI-ALIENATION PROVISION
 
 30
 The Tribe also requests forfeiture on the ground that Idaho's practice of leasing cottage sites constitutes an alienation of the land in violation of the patent.[7] We must apply the same rule here that we applied to the "public park" provision--we must construe "alienation" so as to avoid a forfeiture if possible, and if there is doubt whether the term includes a particular transfer of an interest we must construe the provision against the party seeking forfeiture. While there is some authority for the proposition that leasing may be considered an alienation of land,[8] the more commonly understood meaning of the word is that an alienation is a complete transfer of title rather than a transfer of a leasehold interest.[9] See, e.g., Properties Investment Enterprises v. Foundation for Airborne Relief, Inc., 563 P.2d 307, 309 (Ariz.Ct.App.1977) ("[a]n alienation is a complete, voluntary transfer of title"); 3 C.J.S. Alienate at 771 (1973) ("The term 'alienate' has a technical legal meaning, and any transfer of real estate, short of a conveyance of the title, is not an alienation of the estate."); id. Alienation at 772 ("As a general rule [alienation] excludes any transfer short of the conveyance of the title...." (footnote omitted)). Accordingly, we hold that Idaho's leasing practices do not constitute "alienation" of the land for purposes of forfeiture under the patent.[10]
 
 
 31
 The judgment of the district court is AFFIRMED.
 
 
 32
 REINHARDT, Circuit Judge, concurring and dissenting:
 
 
 33
 While I concur in the conclusion of the majority that the Coeur d'Alene Tribe is not entitled to forfeiture, I disagree strongly with part of the analysis it uses in reaching that conclusion. I also disagree strongly with the majority's suggestions that we should defer automatically to the State of Idaho's interpretation of the term "public park" and that Idaho's Heyburn State Park leasing practice falls within the meaning of that term. I do not believe that leasing prime public land to those who can afford to maintain lakeside summer cottages, and excluding the general public from that portion of the park, complies with the congressional mandate we are obligated to enforce.
 
 
 34
 The basis of the majority's holding with respect to forfeiture, as I understand it, is that forfeiture is appropriate only if we find that Idaho has clearly and unambiguously violated the public park restriction, and that the historical pattern of park leasing in the earlier periods of our country's development precludes such a finding, at least without prior notice or court ruling. With this much of the majority's opinion I concur; however, I do not agree with the portion of the forfeiture analysis in which the majority states that we should construe the term "public park" according to its meaning at the time Congress used the term in 1908. I believe that the interpretation of a term used in an act of Congress concerning a grant of federal land requires us to apply modern day notions of proper public park uses.
 
 
 35
 Beyond the forfeiture issue, the majority appears to decide that Idaho's leasing program constitutes a proper public park use because it is analogous to park uses that have been upheld by other courts, and because, in any case, we should not interfere in the administration of state parks. However, none of the cases that the majority attempts to analogize to the case before us condones the denial of public access to park property so that private individuals may enjoy the exclusive use of such property. Further, the majority's invocation of the shibboleth that the federal judiciary should abdicate its duties rather than interfere with state administrative functions makes absolutely no sense in the context of interpreting a document that conveys realty between two parties, one of which happens to be a state.
 
 
 36
 Accordingly, while I agree that forfeiture is not appropriate, unlike the majority I conclude that the leasing practice complained of here does not constitute a "public park" use and is contrary to the provisions of the federal land patent. I would therefore afford the Tribe declaratory or injunctive relief.
 
 
 37
 A. Contemporary Notions of "Public Park" Should Be Employed in Determining Congress' Intent.
 
 
 38
 The majority and I agree that in interpreting the meaning of the term "public park" the intent of Congress is controlling. However, I do not agree that the meaning of the term was immutably fixed in 1908 and that we should ignore its contemporary meaning.[1]
 
 
 39
 In assessing what Congress meant when it used a general term such as "public park" in one of its enactments, the statutory language should be construed broadly so as to reflect changing circumstances--not narrowly so as to limit its meaning to the applications specifically contemplated at the time of enactment. See, e.g., Diamond v. Chakrabarty, 447 U.S. 303, 315, 100 S.Ct. 2204, 2210, 65 L.Ed.2d 144 (1980) ("This Court frequently has observed that a statute is not to be confined to the 'particular application[s] ... contemplated by the legislators.' " (quoting Barr v. United States, 324 U.S. 83, 90, 65 S.Ct. 522, 525, 89 L.Ed. 765 (1945) and citing Browder v. United States, 312 U.S. 335, 339-40, 61 S.Ct. 599, 601-02, 85 L.Ed. 862 (1941); Puerto Rico v. Shell Co., 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed.2d 235 (1937))); Perry v. Commerce Loan Co., 383 U.S. 392, 397-400, 86 S.Ct. 852, 855-57, 15 L.Ed.2d 827 (1966); see also West Winds, Inc. v. M.V. Resolute, 720 F.2d 1097, 1101-02 (9th Cir.1983); In re Persico, 522 F.2d 41, 64-66 (2d Cir.1975); Consumers Union of U.S., Inc. v. Heimann, 589 F.2d 531, 534 (D.C.Cir.1978); University of Tex. Med. Branch at Galveston v. United States, 557 F.2d 438, 455 (5th Cir.1977). This is particularly true where the language is embodied in a document that is not subject to amendment in the future and so must incorporate a meaning broad enough to encompass new and different circumstances.
 
 
 40
 As Justice Frankfurter aptly described it, "[a]n enactment is an organism in its environment. And the environment is not merely the immediate political or social context in which it is to be placed...." Foreword to Symposium on Statutory Construction, 3 Vand.L.Rev. 365, 367 (1950). The Second Circuit has stated that a court interpreting a statute "must ask itself not only what the legislature means abstractly, or even on the basis of the legislative history, but also what it ought to mean in terms of the needs and goals of our present day society." In re Persico, 522 F.2d 41, 65 (2d Cir.1975) (quoting Phelps, Factors Influencing Judges in Interpreting Statutes, 3 Vand.L.Rev. 456, 469 (1950). One of our judicial functions is to read legislative enactments so as to give them meanings that make sense not only at the time of their passage but also in the future.
 
 
 41
 Construing a statute in light of subsequent events is fully consistent with our obligation to carry out Congress' intent at the time of enactment. Sometimes Congress utilizes a general rather than a specific term because it wishes to let the courts flesh out certain complex aspects of a statute on a case-by-case basis. Other times, being unable to anticipate the specifics of future developments, whether scientific, cultural or otherwise, Congress uses a general term, knowing that its meaning will change in some respects and intending that courts will apply that changed meaning. In both instances, we perform our task of interpreting the statute in light of its overall legislative purpose. Our responsibility was well summarized by Judge Learned Hand:
 
 
 42
 [L]egislators, like others concerned with ordinary affairs, do not deal in rigid symbols.... We can best reach the [statute's] meaning here, as always, by recourse to the underlying purpose, and with that as a guide, by trying to project upon the specific occasion how we think persons actuated by such a purpose, would have dealt with it, if it had been presented to them at the time.
 
 
 43
 Borella v. Borden Co., 145 F.2d 63, 64 (2d Cir.1944), aff'd, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865 (1945). The Second Circuit further described our role by adopting the analysis offered by Professor Llewellyn:
 
 
 44
 Increasingly as a statute gains in age ... its language is called upon to deal with circumstances utterly uncontemplated at the time of its passage. Here the quest is not properly for the sense originally intended by the statute, for the sense sought originally to be put in it, but rather for the sense which can be quarried out of it in the light of the new situation.
 
 
 45
 In re Persico, 522 F.2d at 65 (quoting Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are To Be Construed, 3 Vand L.Rev. 395, 400 (1950)).
 
 
 46
 Interpreting a statute "in light of the new situation" is not always the appropriate method for determining congressional intent. We must recognize the importance of Congress' authority to amend statutes and must be careful not to encroach on its jurisdiction. For example, where a statute concerns a complex, substantially codified body of law, the intentions of Congress are best served by leaving problems created by changed circumstances to the amendatory process. See, e.g., West Winds, Inc. v. M.V. Resolute, 720 F.2d 1097, 1102 (9th Cir.1983) ("the judiciary is not the proper branch of government to update complex statutes when legislative decisionmaking is necessary"). However, here the act in question is not of that type. It does not set forth an intricate legislative scheme requiring careful congressional balancing before changes can be made. In fact, because the Act of 1908 provides for the issuance of a federal land patent, once the patent issues, Congress is precluded from enacting amendments. Where Congress has but one opportunity to legislate in an area that will affect future generations, it must utilize terms that are sufficiently flexible or adaptable to apply to circumstances beyond its immediate contemplation. Unless there is a clear indication of a contrary congressional will, we should interpret those terms in light of modern conditions.
 
 
 47
 The majority agrees that the concept of public park use is "inherently broad and flexible" and is "subject to a host of various interpretations." Majority opinion, at 1293-94. It is clear that our understanding of what constitutes a proper park use has changed over time and with varying conditions. See, e.g., 795 Fifth Ave. Corp. v. City of New York, 40 Misc.2d 183, 242 N.Y.S.2d 961, 971 (N.Y.Sup.Ct.1963) ("[a]s times change, park uses change"), aff'd, 15 N.Y.2d 221, 257 N.Y.S.2d 921, 205 N.E.2d 850 (N.Y.1965); 59 Am.Jur.2d Parks, Squares & Playgrounds Sec. 1 (1971) (noting how historical notion of "park" has changed); 67A C.J.S. Park at 604 (1978) (same). I believe that Congress utilized the term "public park" understanding that its meaning would change with time and circumstances and intending that the Act of 1908 and the patent issued thereunder would be construed in light of those changing circumstances; specifically, I think it apparent that Congress intended Idaho's use of the land to conform at all times to the current meaning of the term "public park."
 
 
 48
 The majority evidently disagrees with my analysis and cites two cases involving federal land patents in which the Supreme Court limited its discussion of congressional intent to what Congress originally intended. Majority opinion, at 1295; Missouri, K. & T. Ry. v. Kansas Pac. Ry., 97 U.S. 491, 497 (1878) (involving question whether Congress had made a present or future grant); Leo Sheep Co. v. United States, 570 F.2d 881, 885 (10th Cir.1977), rev'd on other grounds, 440 U.S. 668, 99 S.Ct. 1403, 59 L.Ed.2d 677 (1979) (involving question whether congressional grant contained, in absence of express reservation of easement, an implied one). In those cases, however, there was no suggestion that a term's meaning had in any way changed or evolved since the date of its inclusion in a bill. Thus, there was no reason to consider whether Congress, in using a general term the meaning of which changes over time, intended that it would be construed in light of society's changed understanding.
 
 
 49
 In the case before us, Congress' purpose was to insure that the Heyburn tract would be preserved for the public's continuing enjoyment.[2] To define the term public park solely in terms of its meaning at the time of passage of the Act of 1908 would serve to limit the public's use of park lands and thus to frustrate, not further, the intent of Congress.
 
 
 50
 B. Idaho's Leasing Practice Does Not Constitute a Proper Public Park Use.
 
 
 51
 Although the lack of certainty in the terms of the patent makes forfeiture an inappropriate remedy, that does not mean that Idaho's leasing program complies with those terms. A wholly different presumption applies where the issue is whether Idaho is in breach--a presumption that strongly supports the Tribe's position. Contrary to the majority's view, I would hold that the state's leasing practice constitutes the privatizing of public lands and violates the patent's requirement that the lands are to be "held, used, and maintained solely as a public park."
 
 
 52
 Forfeiture is but one of the remedies for violation of a patent. Conditions in federal land grants are enforceable by injunction even where there is no express provision to that effect. See Oregon & Cal. R.R. v. United States, 238 U.S. 393, 421-22, 35 S.Ct. 908, 919-20, 59 L.Ed. 1360 (1915). If Idaho's leasing program does not constitute a proper "public park" use, it would be appropriate to enjoin the practice as inconsistent with the patent, or to afford the Tribe declaratory relief.
 
 
 53
 Where relief other than forfeiture is sought, the general requirement that a term be construed strictly against the party seeking relief does not apply. See, e.g., Humphrey v. C.G. Jung Educ. Ctr., 714 F.2d 477, 480 (5th Cir.1983) (discussing distinction between covenants and forfeiture provisions, and the law's preference for the former). Instead, and in sharp contrast to the rule regarding construction of forfeiture provisions, the applicable rule is that federal land grants are to be construed favorably to the federal government. See, e.g., United States v. Union Pac. R.R., 353 U.S. 112, 116, 77 S.Ct. 685, 687, 1 L.Ed.2d 693 (1957); Southern Idaho Conf. Ass'n of Seventh Day Adventists v. United States, 418 F.2d 411, 415 n. 8 (9th Cir.1969). Nothing passes except what is conveyed by clear language; ambiguities are to be resolved against the grantee. See Andrus v. Charlestone Stone Prods. Co., 436 U.S. 604, 617, 98 S.Ct. 2002, 2009, 56 L.Ed.2d 570 (1978); Union Pac. R.R., 353 U.S. at 116, 77 S.Ct. at 687; Humboldt County v. United States, 684 F.2d 1276, 1280 (9th Cir.1982). Under this standard, we must hold that Idaho's leasing practice violates the "public park" restriction unless the record reflects that it clearly and unambiguously constitutes a proper park use. In light of the federal government's current policy against leasing of public park lands, we could not reasonably so construe the record.
 
 
 54
 The record shows that at the beginning of this century demand for recreation was low and it was necessary to use various techniques to encourage people to visit parks. Leasing portions of park lands to private persons was one such technique. The practice had little if any adverse effect on the public since there was more than enough land to satisfy the needs of all those wishing to make use of the parks. It was during that earlier era that the federal government permitted private leases of public park lands. It appears that one reason for Idaho's adopting the leasing program when Heyburn State Park was established was to increase park use.
 
 
 55
 The record also shows unequivocally, however, that since the time the Heyburn leasing program was first put in effect, there have been significant changes in park uses and practices. Demand for park facilities is now very high; there is no longer a need to encourage the public to use public parks by offering long-term private leases of park land. Moreover, removing selected parts of Heyburn Park from public use currently has an adverse general impact, since the public would make use of that land if permitted to do so. The modern view is most clearly reflected in the federal government's present policy of eliminating virtually all leasing of federal park and forest lands. See majority opinion, at 1294. As the majority notes, while leasing was once sanctioned by statute in Glacier National Park and Lassen Volcanic National Park, the statutes have been amended and now expressly prohibit that practice. Id.; see 16 U.S.C. Secs. 162a, 202a (1982).[3]
 
 
 56
 The contemporary decisions of state courts also reflect a more egalitarian view of the proper use of public parks than prevailed in the 1800s. Modern state courts generally recognize that the essential feature of a public use is that it not be confined to wealthy or privileged individuals but be available to all. See, e.g., L-M-S Inc. v. Blackwell, 149 Tex. 348, 233 S.W.2d 286, 290 (1950) (public use concerns the general public " 'as distinguished from particular individuals or estates.' " (quoting 50 C.J. Public Sec. 94 at 864 (1930))); 73 C.J.S. Public at 337 (1983) (same); see also, e.g., Garland v. Clark, 264 Ala. 402, 88 So.2d 367, 370 (1956) (" 'the essence of a dedication to the public uses is that it shall be for the use of the public at large ... and not for any particular part of it' " (quoting 16 Am.Jur. Dedication Sec. 15 at 359 (1938))); Allen v. Village of Savage, 261 Minn. 334, 112 N.W.2d 807, 813 (Minn.1961) (public dedication may not be devoted to private use). Simply put, the contemporary definition of a public park is a tract of land that is open to all members of the public for active or passive recreational use.
 
 
 57
 Under present day circumstances, I fail to see how Idaho's leasing practice can be said to meet the condition of the land patent requiring that the Heyburn tract be devoted solely to use as a public park. Idaho grants to private parties affluent enough to afford the privilege the exclusive long-term use and possession of prime lakefront areas of the park for the construction and maintenance of private summer homes. This practice clearly restricts the use by the public of those portions of the park.[4]
 
 
 58
 I do not mean to suggest that the granting of any temporary right to the exclusive use of park land would necessarily result in an improper "public park" use. For example, issuing permits for overnight camping at designated sites clearly constitutes an appropriate park use even though such permits restrict the use of portions of the park for a specific period of time. I do not believe that we need to decide at what point the duration (or some other characteristic) of a permit for temporary use of park land renders a particular use improper. Cf. Hyland v. City of Eugene, 179 Or. 567, 173 P.2d 464 (1946) (en banc) (providing temporary housing for war veterans during extreme housing shortage after World War II was a permissible park use). Whatever the dividing line, I certainly have no difficulty in concluding that awarding ten-year exclusive leaseholds in prime lakefront property to individuals so that they may maintain private summer cottages on public land is an impermissible "public park" use.
 
 
 59
 C. The Majority's Deference to State Park Administrators Is Improper and Unsupported.
 
 
 60
 The majority appears to say that federal courts should abstain from examining any decision made by state officials relative to any activity in a state park no matter in what context the issue arises. Majority opinion, 1295. The majority even proffers a new standard without citation or support--we must always defer to the administrative whim of state park techno-bureaucrats unless the policy at issue "substantially infringes on an important federal right." Id. In its enthusiasm for abdicating judicial responsibility, the majority offers (1) an incantation of what is rapidly becoming ritualistic dogma--federal courts should not act because they will become embroiled in day-to-day operations that are best left to the states, (2) several examples of cases in which state courts have upheld decisions of public officials with respect to park uses, and (3) the fact that the cottage leases take up only one-third of one percent of the total area of Heyburn State Park. Each of these purported justifications is wholly without merit.
 
 
 61
 First, the fear that we will become bogged down in the complex and mysterious issues that state park administrators face daily is simply irrelevant to the issue before us. We are asked to interpret a term that appears in an act of Congress and in a federal document conveying land. We must determine whether the patentee's actions violate a condition imposed by Congress restricting the use of that land. That the patentee is a state is of no consequence. The task is one to which we are well suited; it is also one that we have an obligation to perform. Under the majority's logic, whenever a state is a party to a conveyance and the interpretation of the conveying document requires an analysis of the actions of state officials, we must always presume those actions comport with the terms of the conveyance and then resolve the matter in favor of the state. Put another way, even though the conveying party is the federal government, represented by the Secretary of the Interior acting pursuant to congressional mandate, the majority would have federal courts decline to recognize any violation of the terms of the instrument by the state because doing so would require us to examine the actions of state officials. This approach is utterly without precedent. The majority's rule of judicial abdication would, if applied consistently, effectively eliminate judicial review of most contracts or conveyances between the federal government and states.
 
 
 62
 Second, the majority's examples of park uses approved by state courts do not support its call for judicial nonintervention. See cases cited in majority opinion, at 1295-1296. In none of the cases cited did a court refuse to review a challenged park use because it did not wish to interfere with the actions of state park administrators. Each case involved a park use that the court found was consistent with the relevant use restriction. Contrary to the majority's claim, the cited cases do not support a general policy of deferring to the discretion of park administrators. In fact, in one of those cases, Hyland v. City of Eugene, 179 Or. 567, 173 P.2d 464, 466 (1946) (en banc), the court, while approving the use of a public park for temporary emergency housing, noted that were the use of a more permanent nature it would have granted injunctive relief against the administrators.
 
 
 63
 Although the majority does not so state, it may be that it cites to these cases because it believes that the uses that were found to be within the meaning of public park are somehow analogous to the long-term summer home leases at issue here. However, no such analogy can be drawn. The dedication of public park property for uses such as Little League baseball,[5] public ice skating rinks,[6] other public sporting facilities,[7] public hotels and restaurants,[8] and public parking beneath San Francisco's Union Square[9] involves either limiting some types of park uses so that one particular use may be more readily enjoyed by all interested members of the public, or constructing facilities that will improve the public's access to or use of the park.[10] Granting decade-long leases that turn park land over to private individuals for their exclusive enjoyment and preclude all public access to prime public lakefront property constitutes a wholly different and far less benign use.
 
 
 64
 Under the Heyburn State Park leasing program, land that Congress expressly directed be preserved for the enjoyment of the public is privatized for the benefit of a small number of individuals wealthy enough to lease and improve summer homes on lakefront property. These individuals are permitted to spend the summer on the shores of Lake Chatcolet on public land from which the public is barred. There is no way in which Idaho's leasing policy can be said to enhance the public 's enjoyment of the land. It benefits only the privileged few.
 
 
 65
 At one point in its opinion, the majority correctly states that " 'a park must be for the benefit of the public at large and open for the use and enjoyment of everyone.' " Majority opinion, at 1294 (quoting 67A C.J.S. Park at 604-05 (1978)). At another, in response to Idaho's argument that its leasing program constitutes a public park use because the lessees are members of the public, the majority properly labels such an argument as "disingenuous." Id. at 1294. However, the majority's then suggests that a system of privatization of park land through long-term leaseholds--a system that prevents public access to the leased land--is somehow analogous to programs designed to enhance public enjoyment of park property. That suggestion is not only ill-founded, but it appears to constitute an inexplicable contradiction of the majority's earlier conclusions.
 
 
 66
 Third, that the cottage lease sites constitute a small fraction of the total acreage of Heyburn State Park cannot justify a policy of judicial noninterference. The statistic cited by the majority is misleading and irrelevant. Obviously, not all of Heyburn State Park's land is shorefront property on Lake Chatcolet. Almost as obvious is the fact that not all shorefront property is suitable for recreational purposes. A more relevant percentage by which to gauge the effect of the privatization of the leased properties is the fraction of usable lakefront land removed from public use by the leases. The Tribe offered evidence that some 85% of the shoreline of Lake Chatcolet is too steep for public use, and that the public is denied the use of one-half of the remaining, usable shoreline by virtue of the leasing program. For purposes of summary judgment, we must assume these facts to be correct. Accordingly, 50% would seem to be a more relevant figure for our purposes than the one-third of one percent figure relied on by my colleagues. In short, the majority's suggestion that the cottage leasing program creates only a minimal interference with the public's enjoyment of Heyburn State Park is incorrect; the suggestion is not only based on the use of an inappropriate criterion but is clearly contrary to the evidence.
 
 Conclusion
 
 67
 I agree with the majority that in light of the evidence regarding historic park practices we cannot say that Idaho has clearly and unambiguously violated the "public park" restriction of the patent. Accordingly, imposition of the harsh remedy of forfeiture is inappropriate, at least in the absence of a prior judicial declaration as to the rights of the parties. Nevertheless, I would hold that Idaho's practice of granting private individuals the ten-year right to exclusive use and possession of portions of the park for summer homes is inconsistent with the contemporary understanding of the term "public park" use. Thus, I would conclude that Idaho's leasing practice is in violation of the terms of the land patent and would direct the entry of a decree of declaratory relief in favor of the Tribe. I would also remand the matter so that the Tribe could, if it chose, seek an injunction from the district court.
 
 
 
 *
 Donald P. Hodel has been substituted for William P. Clark as defendant in this appeal pursuant to Fed.R.App.P. 43(c)(1)
 
 
 [1]
 The cottage site leases executed before 1972 provided no express right of access to the public. Those leases executed after 1972 allowed the public the right of ingress and egress to the adjoining beach
 
 
 [2]
 In this opinion we held that the Act of 1906 created a beneficial interest in the Tribe and that the Act of 1908 did not evince a clear congressional intent to extinguish that beneficial interest. Idaho now argues that our holding should be reconsidered in light of an intervening United States Supreme Court decision, Solem v. Bartlett, 465 U.S. 463, 104 S.Ct. 1161, 79 L.Ed.2d 443 (1984), which, it contends, clearly indicates that the establishment of Heyburn State Park diminished the Tribe's reservation. But Solem dealt only with diminishment of Indian land, which, as we pointed out in our previous decision, is a question that is distinct from the one presented here, that of extinguishment of rights. See Idaho v. Andrus, 720 F.2d at 1464-65 (citing Rosebud Sioux Tribe v. Kneip, 430 U.S. 584, 601 n. 24, 97 S.Ct. 1361, 1370 n. 24, 51 L.Ed.2d 660 (1977)); Swim v. Bergland, 696 F.2d 712, 717 (9th Cir.1983). Congress may diminish Indian land without extinguishing title to the land. See Idaho v. Andrus, 720 F.2d at 1464-65; see also United States ex rel. Hualpai Indians v. Santa Fe Pacific R.R., 314 U.S. 339, 354, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941) (cautioning against implying extinguishment); United States ex rel. Chunie v. Ringrose, 788 F.2d 638, 642 (9th Cir.1986) (same). Because Solem does not address the proper analysis of a claim of extinguishment, we do not find it necessary to reconsider our previous decision
 
 
 [3]
 We also point out that a power of termination clearly may be exercised by filing suit, as the United States did here. See, e.g., 1 American Law of Property Sec. 4.9 (1952) ("[t]oday by the weight of authority ... an action by the conveyor to recover the possession ... constitutes the election to forfeit" (footnote omitted)); 4A Thompson on Real Property Secs. 1979, at 389-91; 1981, at 409 (1979 Replacement) ("a suit for the possession of the land ... is equivalent to a re-entry" (footnote omitted)). In fact, it may be that the United States can only exercise a power of termination by filing suit. See New York Indians v. United States, 170 U.S. 1, 24-25, 18 S.Ct. 531, 536-37, 42 L.Ed. 927 (1898)
 
 
 [4]
 In New York Indians, land was granted to Indians by a treaty that contained a forfeiture provision. The case might therefore be explained on the ground that treaties with Indians are to be liberally construed in favor of the Indians. See, e.g., Antoine v. Washington, 420 U.S. 194, 199-200, 95 S.Ct. 944, 948, 43 L.Ed.2d 129 (1975). If this were the case, the principle followed in New York Indians might be inapplicable to the present case because the grantee here is the state of Idaho, not an Indian tribe. Likewise, the discussion in Oregon & Cal. R.R. might be explained on the basis that railroads are accorded more favorable treatment than other grantees of public lands. See Leo Sheep Co. v. United States, 440 U.S. 668, 682-83, 99 S.Ct. 1403, 1411, 59 L.Ed.2d 677 (1979). However, in neither opinion does the Court indicate that its adherence to the general rule requiring strict construction of forfeiture provisions is dependent on or related to the fact that the grantees were Indians or a railroad; the Court's only citation in each case is to a property law text. See Oregon & Cal. R.R., 238 U.S. at 420, 35 S.Ct. at 919; New York Indians, 170 U.S. at 25-26, 18 S.Ct. at 537
 
 
 [5]
 The Tribe contends that the 1911 patent must be construed in favor of the Tribe by virtue of the general rule that ambiguities in treaties and agreements with Indians, and statutes ratifying the same, "are to be resolved in favor of a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith." Antoine, supra note 4, 420 U.S. at 200, 95 S.Ct. at 948 (quoting Choate v. Trapp, 224 U.S. 665, 675 (1912)). This canon of construction recognizes the United States's "presumptively superior negotiating skills and superior knowledge of the language," and prevents the government from taking unfair advantage of this unequal bargaining position. Washington v. Washington State Commercial Passenger Fishing Vessel Assoc., 443 U.S. 658, 675-76, 99 S.Ct. 3055, 3069, 61 L.Ed.2d 823 (1979); see also F. Cohen, Handbook of Federal Indian Law 222 (1982 ed.). However, this rationale does not apply to this case; the patent here involves an agreement between the United States and Idaho, not between the Tribe and the United States (or any other party)
 
 
 [6]
 We are not restricted to those facts relied upon by the district court, but must consider the grant of summary judgment on the basis of all facts in the record before us. Nor are we limited to the grounds on which the district court's decision was based. See Fristoe v. Reynolds Metals Co., 615 F.2d 1209, 1213 (9th Cir.1980) (appellate court may uphold summary judgment on ground not considered by trial court)
 
 
 [7]
 It is well-settled that unqualified restraints on alienation are generally invalid. See e.g., Idaho Code Sec. 55-111 (1979) (originally R.S. Sec. 2836) (prohibiting unqualified restriction on alienation of real property "by any limitation or condition whatever"); 5A Powell, The Law of Real Property p 840 (1985) ("Any provision which, without qualification, undertakes to deny the conveyee of a legal estate in fee simple power to alienate his acquired estate is invalid." (footnote omitted)). Ordinary rules of property law should not, however, be allowed to thwart the clear intent of Congress, see, e.g., Missouri, Kansas, and Texas Ry., 97 U.S. at 497, and Congress by the 1911 patent prohibited alienation of the Heyburn Park land. Moreover, courts are somewhat more willing than usual to uphold a restraint on alienation when contained in a grant of land for public use. See, e.g., Smedley v. City of Waldron, 739 F.2d 399, 400-01 (8th Cir.1984) (per curiam) (Arkansas law). However, even if the anti-alienation provision in this case is valid, it must be construed narrowly for purposes of a forfeiture proceeding
 
 
 [8]
 For example, according to Professor Powell, provisions in conveyances prohibiting the leasing of the conveyed premises are often regarded as "restraints on alienation," see 5A Powell, The Law of Real Property p 842 at 77-13 n. 1, 77-17; thus, it appears that "alienation" is a general category which may include leasing
 The Tribe relies on the statement in 5 Thompson on Real Property Sec. 2395 at 193 (1979 Replacement) that " 'alienation' embraces every mode of passing real estate by act of the parties, as distinguished from passing it by operation of law." This passage, however, is contained in a discussion of the various means by which title to property may be passed. Thus, read in context, the quotation explains only that "alienation" refers to passage of title by act of the parties as opposed to by operation of law.
 
 
 [9]
 Idaho has at all relevant times retained title to the land in question
 
 
 [10]
 This interpretation is also the one that was consistently placed on the word "alienation" in the homestead laws at the time the patent was issued in 1911. See, e.g., Stark v. Morgan, 85 P. 567 (Kan.1906) (mortgage not "alienation" because did not pass title). In Boulton v. Telfer, 52 Idaho 185, 12 P.2d 767 (Idaho 1932), the Supreme Court of Idaho construed a provision in the federal homestead laws prohibiting alienation of land by homestead entrants for a certain period following entry. The homesteader had leased part of his land for grazing. The court concluded that such leasing did not constitute "alienation": "Alienation within the meaning and spirit of said sections [of the Homestead Act] must affect the title or be such a conveyance of such a qualified interest as might become absolute on patent passing from the United States." Id., 12 P.2d at 770. Although the interpretation of "alienation" in the homestead laws is not necessarily controlling here, we believe it is nevertheless relevant to our effort to determine Congress's intent when it withdrew the Heyburn Park land from homestead entry and transferred it to Idaho with an unqualified prohibition on "alienation."
 
 
 [1]
 The majority's insistence on giving the term "public park" the meaning it had in 1908 does not affect the outcome of the forfeiture question; it does, however dictate the majority's additional and erroneous conclusion that Idaho's leasing practice does not violate the patent
 
 
 [2]
 Congress, as well as the State of Idaho and the Tribe, was also concerned about the immediate threat that the tract might be acquired by commercial logging interests. See State of Idaho v. Andrus, 566 F.Supp. 15, 18 n. 1 (D.Idaho 1982), set aside on other grounds, 720 F.2d 1461 (9th Cir.1983), cert. denied, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984). Idaho's Senator Heyburn, for whom the park was named, originally introduced legislation to make the property a national park. See 720 F.2d at 1467 & n. 1. Congress was reluctant to do so because of its concern over the need to provide continuing federal funding for operating purposes. See 566 F.Supp. at 18. Granting the land to Idaho for a state park served to guarantee the public's unfettered enjoyment of the tract and to eliminate the need to provide continuing federal funding
 
 
 [3]
 Professor David Towne, Idaho's expert witness, testified without contradiction that since the 1950s or 1960s the federal government's policy has been to proscribe leasing of public park land, and that this change in attitude toward proper park use is directly attributable to the greater use of parks by the public
 
 
 [4]
 Ironically, the results of this practice appear not to be particularly salutary in other ways as well. The 1975 Annual Report on Heyburn State Park, prepared by Heyburn State Park Manager Bryan Rowder, states:
 Cabin areas are overused and cluttered looking because of closeness. The cabin area gives a feeling that you are in a crowded resort town, rather than a park.... The cabins gradually are becoming permanent residences, resulting in the urbanization of Heyburn State Park. Some cabin owners seem to think we are their city employees, who are supposed to take care of the trees around their lots, keep their driveways in good condition, plow snow so they can all get to work easy [sic] without buying snow tires or chains, guard their private property against theft and vandalism, etc.
 
 
 [5]
 Shields v. City of Philadelphia, 405 Pa. 600, 176 A.2d 697 (1962)
 
 
 [6]
 Summit County Hist. Soc'y v. City of Akron, 115 Ohio App. 555, 183 N.E.2d 634 (1961)
 
 
 [7]
 Aquamsi Land Co. v. City of Cape Girardeau, 346 Mo. 524, 142 S.W.2d 332 (1940)
 
 
 [8]
 795 Fifth Ave. Corp. v. City of New York, 13 A.D.2d 733, 215 N.Y.S.2d 391 (1961); Harter v. City of San Jose, 141 Cal. 659, 75 P. 344 (1904)
 
 
 [9]
 City & County of San Francisco v. Linares, 16 Cal.2d 441, 106 P.2d 369 (1940)
 
 
 [10]
 One other case cited by the majority, Hyland v. City of Eugene, 179 Or. 567, 173 P.2d 464 (1946) (en banc), held that it was a permissible public park use to lease out land as sites for mobile homes in order to provide temporary housing for World War II veterans during an extreme post-war housing shortage. As I have already mentioned, the court expressly stated that it would have enjoined the practice had it been of a more permanent nature. See text supra at 1293; Hyland, 173 P.2d at 466